IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| **JOHNNY POTTS and JANICE POTTS,** | § | |
| **Plaintiffs,** | § | |
| | | **Civil Action No.** |
| **v.** | § | |
| | | **3:06-cv-00124-WHA-CSC** |
| **DYNCORP INTERNATIONAL LLC,** | § | |
| **JAMES McCANTS, et al.,** | | |
| | § | |
| **Defendants.** | | |

**DEFENDANT DYNCORP INTERNATIONAL LLC'S
BRIEF IN SUPPORT OF MOTION TO AMEND ANSWER
TO ASSERT DEFENSE OF LACK OF SUBJECT MATTER JURISDICTION**

COMES NOW defendant DynCorp International LLC ("DI") and submits this brief in support of its motion to amend its Answer to the plaintiffs' Complaint to assert the defense of lack of subject matter jurisdiction. The Court should allow the amendment and decline to exercise jurisdiction over this matter because it is nonjusticiable as a result of the "political question" doctrine. In support of this brief, DI relies upon the pleadings previously filed herein, the narrative summary of undisputed material facts and brief below, the materials filed in support of this motion, the affidavits of David M. Moore and Henry M. Miller, the deposition of James D. McCants, and the applicable law.

## Introduction and Summary of Grounds for Defense

The plaintiff sustained injury in Iraq on September 3, 2004, when the vehicle in which he was riding overturned on a highway near Trebil, Iraq, while the convoy faced a security threat. The vehicle was part of a security convoy that had taken Potts to Trebil to work on some radio equipment at defendant DI's facility near Iraq's Jordanian border. Rebuilding Iraq was both a military and foreign policy priority for the United States. Protecting the people and materials involved in that effort from attack by insurgents became a necessary aspect of that mission. DI had a contract with the United States government to provide security for convoys delivering materials both for humanitarian assistance and for reconstruction of Iraq's infrastructure.

The Court lacks subject matter jurisdiction, or this dispute is nonjusticiable, because it involves what constitutes a "political question" reserved under the United States Constitution to the political branches of the government, i.e., the legislative and executive branches. To render a decision in this case, the Court and jury would necessarily pass judgment upon security activities set forth in DI's contract, which was an expression of United States foreign policy. The Court, however, should not render judgment over the executive branch's security activities in Iraq. Put differently, the Court should not undertake to apply Alabama tort law to security practices adopted for use in Iraq's hostile environment and thereby establish a standard of care for dealing with security threats that would be wholly

2

inappropriate in Iraq. To do so would usurp the political branches' policy-making prerogatives to establish what, if any, standards they might deem to be necessary.

The "political question doctrine," set out in *Baker v. Carr*, 369 U.S. 186 (1962), holds that no court of the United States has jurisdiction over a claim involving the policy choices of a coordinate branch of the federal government. Therefore, any suit against the defendants in this case pertaining to their actions in furtherance of United States foreign policy are non-justiciable controversies under the political question doctrine and this Court should decline to hear the claims.

## Narrative Summary of Undisputed Facts

**1.      The Accident occurred while a DI security convoy carrying the plaintiff on a mission was encountering what it perceived to be a security threat.**

Plaintiff Johnny Potts sustained personal injuries in Iraq on September 3, 2004, when one vehicle in a security convoy taking him on a mission overturned on a highway near Trebil, at the Jordanian border. (Complaint ¶ 11; deposition of James McCants ("McCants Depo." ) at 109-10; Affidavit of David M. Moore ("Moore Aff.") at ¶ 14). Potts was an employee of Worldwide Network Services (WNNS), an electronics and communications firm subcontracted with Defendant DI. (Complaint ¶ 1; Moore Aff. at ¶ 13).

3

The convoy had driven from Baghdad to Trebil so that Potts could install Codan high frequency radio equipment at DI's site in Trebil. (Complaint ¶ 11; Moore Aff. at ¶ 14) . The convoy had increased its speed to pass some vehicles parked beside the highway, which was considered a security threat, when, according to the plaintiff, a dog came onto the highway. (McCants Depo. at 107; Complaint ¶ 11). James McCants, the driver of the vehicle in which Potts was riding, attempted to avoid the dog, and the vehicle overturned. (Complaint ¶ 11; McCants Dep. at 109-10).

At his deposition, however, McCants did not concede that the object that he attempted to evade was a dog but rather said it was a "black object" that he feared might be an IED ("Improvised Explosive Device") (McCants Dep. at 109; 125). Traveling at high speed is a tactic used in Iraq to evade security threats, including the presence of parked Iraqi vehicles. (McCants Dep. at 81-83, 107, 138-43). Potts testified that he had been in fire fights with insurgents and also had encountered IEDs during his Iraqi tour prior to the Potts accident. (McCants Dep. at 129-31). The road between Trebil and Baghdad is quite dangerous, and many of the cities in which the convoy must pass were considered constant sources of danger for passers-by. (McCants Depo. p. 81, 97).

## 2.     The rebuilding of Iraq in the aftermath of the war is an expression of United States military and foreign policy, and the provision of security for those engaged in the rebuilding was an extension of U.S. policy.

"Rebuilding Iraq is a U.S. national security and foreign policy priority and constitutes the largest U.S. assistance program since World War II." Government Accountability Office, Report to Congressional Committees, Pub. No. GAO-05-876, REBUILDING IRAQ Status of Funding and Reconstruction Efforts 1 (2005)("GAO Reconstruction Report").

> The United States is spending billions of dollars to reconstruct Iraq while at the same time is engaged in combating an insurgency that has targeted military personnel, contractors, and the Iraqi people. According to the Department of Defense (DOD and other sources, as of June 1, 2005, more than 1,600 U.S. and coalition military forces and 200 contractor personnel have been killed since major combat operations ended in May 2003. This uncertain security environment created a need for U.S. government agencies and contractors involved in rebuilding Iraq to obtain substantially more security services than is normally the case when operating in other countries. Creating a democratic Iraq and rebuilding its infrastructure is a U.S. national security and foreign policy priority, and, even without the need for enhanced security, is a challenging and complex effort.

Government Accountability Office, Report to Congressional Committees, Pub. No. GAO 05-737 REBUILDING IRAQ Actions Needed to Improve Use of Private Security Providers 1 (2005)("Iraq Security Report").

By August 2003, the bombing of the United Nations complex hade made it clear that own that insurgents were targeting nonmilitary targets. *Id.* The deaths in March 2004 of four U.S. citizens working for a U.S. security provider and the allegations of prison abuse at Abu Ghraib prison raised significant congressional concern over the use of private security providers in Iraq and posed a number of operational, legal, and contracting questions. *Id.*

Numerous congressmen have asked the Comptroller General to review the operational, legal, and contracting issues involving the use of private security providers in Iraq. *Id.* at 1 and n. 2. Congress also enacted legislation that directed the Secretary of

5

Defense to submit a report to the Armed Services committees of both houses providing information concerning private security companies providing security for Iraq reconstruction efforts. *Id.* at 1 and n. 2; *see also* Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, § 1206, 118 Stat. 1811, 2084-85.

In March 2005, two reconstruction projects worth nearly $15 million were cancelled to help pay for security at a power plant, and Government Accountability Office found that the cost to obtain private security providers and security-related equipment and security-related equipment accounted for more than of 15 percent of contract costs of eight of 15 contracts it studied. (Iraq Security Report Introduction).

**3.      Defendant DynCorp International LLC's contract with the federal government was an expression of the United States' foreign policy to protect efforts to rebuild Iraq.**

The Coalition Provisional Authority, the interim governing authority in Iraq administered through the U.S. Department of Defense, had originally contracted with DI in November 2003 to provide security for convoys bringing humanitarian assistance into Iraq through four border points under the UN's Oil-For-Food program (OFF). (Moore Aff. ¶ 3 and Moore Aff. Ex. B; GAO Reconstruction Report p. 5, Fig. 1). When the CPA was dissolved on June 30, 2004, DI's security contract was extended by the Project and Contracting Office, a U.S. government entity operated by the Department of Defense but under the authority of the Department of State. (Moore Aff. ¶ 19 and Moore Aff. Ex. F;

GAO Reconstruction Report p. 4). DI's essential mission of security remained, but it was modified to include security for the movement of materials being used for reconstruction projects. (Affidavit of Henry M. Miller ¶ 3 ("Miller Aff.")).

The contract's Statement of Work sets forth in considerable detail how the security contractor, i.e., DI, would perform its work. (Moore Aff. Ex. B, Statement of Work). It provided almost $600,000 for the procurement of weapons and ammunition for its employees. (*Id.* at p. 3). It necessarily contemplated the need for DI to evade or engage hostile forces in the course of fulfilling the requirements of its contract.

The contracting officials with whom DI dealt in negotiating and administering the contract included civilian employees of the United States government and United States military personnel. (Moore Aff. ¶ 16). Under the PCO contract, DI followed the coordination decisions of the Contracting Officer's Representative, U.S. Marine Corps Maj. Timothy Callahan. (Miller Aff. ¶ 4). Furthermore, DI was subject to post-contract performance evaluations by the Defense Contract Auditing Agency. (Moore Aff. ¶ 17). This is an agency of the United States Department of Defense that performs on audits only upon contractors working under the U.S. military and U.S. government. (Moore Aff. ¶ 17).

<u>**Argument**</u>

**The activities made the basis of this civil action were performed under contract with federal agencies and constitute an expression of United States foreign policy; consequently, regulation of these activities constitute a political question that does not present a justiciable controversy for this Court.**

I.    **Background of non-justiciability doctrines, in general, and the political question doctrine, in particular.**

While subject matter jurisdiction *per se* is derived from Article III, § 2 of the Constitution and applicable statutes, generally 28 U.S.C. §§ 1331 and 1332, justiciability is derived purely from the Constitution. Erwin Chemerinsky, *Federal Jurisdiction* § 2.1, p. 44 (4th ed. 2003). The justiciability doctrines have all been created by the United States Supreme Court and include: the prohibition against advisory opinions, standing, ripeness, mootness, and the political question doctrine. *Id.* Therefore, justiciability generally deals with the power of a court to hear a case based upon the subject matter of that case.

A claim may or may not be justiciable based upon whether the judicial resolution of that controversy would be consistent with the separation of powers set out in the United States Constitution. *Baker v. Carr*, 369 U.S. 186, 210 (1962); *Aktepe v. United States*, 105 F.3d 1400, 1402 (11th Cir. 1997); *Tiffany v. United States*, 931 F.2d 271, 276 (4th Cir. 1991).

The jurisdiction of the federal courts in a particular matter is not simply based upon a single federal statute. *Atkepe*, 105 F.3d at 1402. Instead, the interplay between the Constitutional requirements, such as the separation of powers of the distinct branches of the federal government, must be examined and those Constitutional mandates must be followed above any particular statute. *Id.*; *Tiffany*, 931 F.2d at 276. Flowing directly from the separation of powers doctrine set forth in the Constitution is the restriction preventing federal courts from exercising jurisdiction over "political questions," i.e., those cases involving the policy decisions of either the legislative or executive branches of the federal government. *Japan Whaling Ass'n v. American Cetacean Soc.*, 478 U.S. 221, 230 (1986); *Aktepe*, 105 F.3d at 1402; *Abebe-Jira v. Negewo*, 72 F.3d 844, 848 (11th Cir. 1996).

**II.    Military affairs and foreign policy, including review of military policies, training or practices fall under the political question doctrine.**

The Constitution vested the conduct of foreign policy and the military in the President and Congress. *See* U.S. Const. art. I, § 8, cls. 11-16; U.S. Const. art. II, § 2 (giving President power to enter treaties and name ambassadors and consuls with the advice and consent of the Senate and making the President commander-in-chief of the military), *see Aktepe*, 105 F.3d at 1403. Because control of foreign policy and military affairs was so clearly granted to the executive and legislative branches, a number of courts, including the United States Supreme

9

Court, have held that cases involving foreign policy and military affairs are generally considered non-justiciable and are rarely the proper subject of litigation in the federal courts. *Haig v. Agee*, 453 U.S. 280, 292 (1981); *Aktepe*, 105 F.3d at 1403; *Tiffany*, 931 F.2d at 277. The United States Supreme Court, and a number of Circuits, have clearly held that the courts have no place second-guessing the policy of the military. *See, e.g., Gilligan v. Morgan*, 413 U.S. 1 (1973); *Aktepe*, 105 F.3d at 1404; *Tiffany*, 931 F.2d at 277.

When examining the justiciability of a claim, the District Court is not foreclosed from considering the cause stated by the plaintiff, but "the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be molded." *Baker*, 369 U.S. at 198; *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum*, 577 F.2d 1196, 1202 n.9 (5th Cir. 1978).

While discussing a suit by former college students for continuing declaratory relief pertaining to the training, use and methods of the Ohio National Guard, the Supreme Court stated:

> It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible–as the Judicial Branch is not–to the electoral process. Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability. It is this power of

10

oversight and control of military force by elected representatives and officials which underlies out entire constitutional system.

*Gilligan*, 413 U.S. at 10.

Furthermore, in *Atkepe*, the Eleventh Circuit cited three cases, including *Gilligan*, in which the Supreme Court was unwilling to allow a federal court to hear cases in which the district court would ultimately be required to review the functioning of the military, including military decisions related to personnel, discipline and training. *See* 105 F.3d at 1403 citing *Chappell v. Wallace*, 462 U.S. 296, 304 (1983) (military officers may not maintain a civil suit in civilian courts against superior officers for constitutional violations); *Gilligan*, 413 U.S. at 5-13 (suit for injunctive action against Ohio National Guard based on the Guard's use, training, etc., may not be heard by the judiciary); *Orloff v. Willoughby*, 345 U.S. 83, 90-92 (1953) (refusing to take jurisdiction over military doctor demanding commission as per statute).

It is clear from the cases cited above, that this doctrine applies to suits against the U.S. military or its personnel. However, these cases may apply with equal force to an independent actor performing services on behalf of the U.S. government, if the purposes of the doctrine are met and require its use.

11

**III.    The "political question" doctrine applies to independent contractors performing tasks that constitute expression of United States foreign policy.**

The Supreme Court has identified six hallmarks of political questions that a District Court must examine in making the determination whether a particular suit presents a justiciable controversy:

(1)    a textually demonstrable constitutional commitment of the issue to a coordinate political department;

(2)    a lack of judicially discoverable and manageable standards for resolving it;

(3)    the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;

(4)    the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;

(5)    an unusual need for unquestioning adherence to a political decision already made; or

(6)    the potentiality of embarrassment from multifarious pronouncements by various departments on one issue.

*Baker v. Carr*, 369 U.S. 186, 217 (1962). The presence of any one of the six may remove a controversy from the bounds of proper justiciability, but at least one must be evident to invoke the political question doctrine. *Atkepe*, 105 F.3d at 1403-04. The six factors "are probably listed in descending order of both importance and certainty." *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004). Determining justiciability under the political question doctrine requires "analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in light of its nature and posture in the specific case, and of the potential consequences of judicial action." *Baker*, 369 U.S. at 211-12.

It is fairly clear that suits against the military which would require the court to question military policy fall under this doctrine. The Eleventh Circuit stated its opinion on this topic most recently in *Aktepe v. United States*, 105 F.3d 1400, 1402 (11th Cir. 1997). *Atkepe* involved an accident during a NATO training session. In *Atkepe*, a U.S. ship inadvertently fired two live missiles at a Turkish ship, killing two sailors and injuring hundreds of others. *Id.* at 1401-02. The personal representatives of the deceased sailors, along with the injured sailors, brought suit directly against the United States. *Id.* at 1402. The Eleventh Circuit found that the situation presented in *Atkepe* exhibited most, if not all, of the political question indices identified in *Baker v. Carr*. *Id.* at 1403. Specifically, the court held that the Constitution explicitly commits issues related to military policy to the legislative and executive branches (Factor #1); there was no judicially discoverable and

13

manageable standard raised, because the court must examine how a reasonable military force would have acted under the circumstances, not merely what a reasonable person would have done (Factor #2); any decision of the court would involve a review of the policy of the military in conducting its exercises and training (Factor #3); and the application of standard tort law into the functioning of the military and military affairs would, in effect, give the judicial branch oversight of areas specifically committed to other branches of government (Factor #4). *Id.*

The situation in *Atkepe* is different from that presented here, because the United States military was directly involved in the allegations of the *Atkepe* plaintiffs. In the situation at bar, DI was an independent contractor under the direction of the Department of Defense (through the CPA) and the Departments of State and Defense under the PCO and Office of Security Transfer. However, two district courts have recently examined situations similar to that presented here, in which claims were brought against independent contractors and both courts dismissed the plaintiff's claims, as non-justiciable, based on the political question doctrine.

In *Whitaker v. Kellogg Brown & Root, Inc.*, the parents of a deceased soldier brought suit against Kellogg Brown & Root, Inc. ("KBR"), the contractor charged with operating a convoy. __ F.Supp.2d __, 2006 WL 1876922, *1 (M.D. Ga. July 6, 2006). One of KBR's drivers knocked a guard rail off of a bridge and then the decedent's transport was hit by

another KBR driver from behind and the soldier fell from the bridge and drowned in the Tigris River when he attempted to exit his vehicle. 2006 WL 1876922 at *1.

*Smith v. Halliburton Co.* involved a suit against the independent contractors operating a dining facility in Iraq for the United States military. CV No. 4:06-0462-H (S.D. Tex. Aug. 30, 2006) (attached as Exhibit F). The plaintiffs were the personal representatives of a man killed when a suicide bomber entered the facility and set off a makeshift bomb. *Id.*

In both *Whitaker* and *Smith*, the respective District Courts held that the political question doctrine was implicated, though the only defendants were independent contractors and not the U.S. military. *Whitaker*, 2006 WL 1876922 at *3; *Smith*, 4:06-0462-H at p. 13-14. In each case, the court recognized that the independent contractors were acting on behalf of, or based on orders given by, the U.S. military. *Whitaker*, 2006 WL 1876922 at *3; *Smith*, 4:06-0462-H at p. 14-15. The fact that the military chose to employ independent contractors, as opposed to performing the activities itself, did not alter the fact that hearing the controversy would involve reviewing the policy of the military; and, of course, the control of the military is explicitly placed in the hands of the legislative and executive branches of the federal government. *Whitaker*, 2006 WL 1876922 at *3; *Smith*, 4:06-0462-H at p. 15.

This case presents facts sufficiently analogous to those in *Whitaker* and *Smith* to require the dismissal of this action as a non-justiciable claim. The same factors set out in *Baker v. Carr*, and implicated in *Whitaker* in particular, are present here. If this action

proceeds, this Court will ultimately be asked to substitute its judgment for that of coordinate branches of government on the such issues as:

- The adequacy and reasonableness of training related to travel within an area posing security threats to personnel employed by government agencies and contractors, such as in Iraq;

- Whether it is appropriate for the DOD and DOS to send civilian contractors to perform activities that constitute expressions of United States military and foreign policy in areas that pose a danger to their physical safety.

- The likelihood of attack by Iraqi insurgents and the appropriateness of tactics for government security contractors to use in avoiding or preventing such attacks while traveling in Iraq; and

- How a reasonable driver in a government contractor's security convoy who is driving in a dangerous war-zone should reasonably be expected to act when faced with a potentially deadly situation in a war zone.

All of the above issues would have to be addressed by the Court because each of the issues relates, in some manner, whether directly or as a potential defense, to the ultimate question in any negligence action: what would a reasonable person do under the circumstances surrounding the plaintiff's allegations?  To ask a District Court to determine any of the above issues would require an analysis of the policy of a coordinate branch of government and, therefore, implicates the political question doctrine.

**IV.    Four of the six Baker v. Carr factors are implicated in any determination of the plaintiffs' claims, therefore the claim is non-justiciable.**

A.    *Baker v. Carr* Factor One–The facts of this claim involve the conduct of a contractor hired to perform security services constituting an exercise of a United States foreign policy and military objective, and such activities are constitutionally committed to the executive and legislative branches of the federal government.

The judicial branch lacks the constitutional jurisdiction to decide "political questions" because those questions do not present cases or controversies within the meaning of Article III of the Constitution. *State of New Jersey v. United States*, 91 F.3d 463, 469-70 (3rd Cir. 1996); *Tiffany*, 931 F.2d at 276; *Eveland v. Director of Central Intelligence Agency*, 843 F.2d 46, 49 (1st Cir. 1988) *Occidental of UMM al Qaywayn, Inc.*, 577 F.2d at 1203. The bases for the political question doctrine are the constitutional separation of powers amongst the branches of the federal government and the inherent limitations of the judiciary to decide policy matters. *Baker*, 369 U.S. at 210; *Occidental*, 577 F.2d at 1203. The judiciary is not well-equipped to formulate national policy and such matters are better suited for those branches of government which are elected and responsive to the will of the people. *Japan Whaling Ass'n*, 478 U.S. at 230 ("The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations

17

constitutionally committed for resolution to the halls of Congress or the confines of the

Executive Branch."); *Gilligan*, 413 U.S. at 8 ("Trained professionals, subject to the day-to-

day control of the responsible civilian authorities, necessarily must make comparative

judgments on the merits as to evolving methods of training, equipping, and controlling

military forces with respect to their duties under the Constitution. It would be inappropriate

for a district judge to undertake this responsibility in the unlikely event that he possessed

requisite technical competence to do so.").

National security and foreign affairs typically implicate the political question doctrine,

as they "frequently turn on standards that defy judicial applications or involve the exercise

of discretion demonstrably committed to the executive or legislature." *Baker*, 369 U.S. at

211. Control of the policy, training and strategy of the military is specifically granted to the

legislative and executive branches. *Aktepe*, 105 F.3d at 1403; *Whitaker*, 2006 WL 1876922

at *3. *See* U.S. Const. art. I, § 8, cls. 11-16; U.S. Const. art. II, § 2. Claims involving

military contractors also implicate the policy and practice of the military and therefore should

be considered political questions. A number of other courts have held that claims by military

or civilian personnel against defense contractors arising out of an alleged act of negligence

by that contractor, while performing activities in a war-zone or combat-related scenario,

presents a non-justiciable political question. *See Smith*, 4:06-0462-H at p. 18 (dismissed

contractor operating mess tent in wrongful death action on behalf of soldier killed by suicide

bomber in the mess tent); *Whitaker*, 2006 WL 1876922 at *3-4 (finding that a claim for

18

wrongful death in which a soldier fell into the Tigris River and drowned as a result of the alleged negligence of the employees of a contractor organizing the convoy presented a non-justiciable political question); *Bentzlin v. Hughes Aircraft*, 833 F.Supp. 1486 (C.D. Cal. 1993) (defense contractor dismissed, based indirectly on the political question doctrine, from wrongful death action on behalf of soldiers related to "friendly fire" incident during Operation Desert Storm); *Zuckerbaum v. General Dynamics Corp.*, 755 F.Supp. 1134 (D. Conn. 1990) (contractors dismissed from wrongful death action based on the political question doctrine where Navy sailors were killed by Iraqi attack on a United States vessel); *Nejad v. United States*, 724 F.Supp. 753 (C.D. Cal. 1989) (political question doctrine required dismissal of military contractor where wrongful death action was brought by personal representatives of Iranian civilians killed when a plane was shot down by a United States vessel in the Persian Gulf).

The courts in the above-cited cases found that the political question doctrine applies to both direct suits against the United States, or the U.S. military, that implicate policy decisions *and* to suits against independent contractors performing services on behalf of the military or in conjunction with the military war effort. "When the military seeks to accomplish its mission by partnering with government contractors who are subject to the military's orders, regulations, and convoy plan, the use of civilian contractors to accomplish the military objective does not lessen the deference due to the political branches in this area." *Whitaker*, 2006 WL 1876922 at *3.

DI contracted with the CPA, which operated under the U.S. Department of Defense and the Projects and Contracting Office, which falls under the auspices of the Department of State but which is actually run by the Department of Defense. The actions of the CPA and PCO in contracting with companies to provide security for other contractors working within the war zone in Iraq, is no less a question of the overall military and foreign policy of the executive and legislative branches of the U.S. government than contracts between the military services themselves and their independent contractors. Further evidence of the tie between these contracts and the war effort is the post-performance review by the Defense Contract Auditing Agency, a branch of the Department of Defense.

The plaintiff and McCants were both engaged in activities inextricably intertwined with United States foreign policy and military policy in Iraq at the time of incident made the basis of this suit. This Court will be forced to review policies and practices of a coordinate branch of government, i.e., the Executive Branch, if it is to arrive at a determination of this claim, including issues pertaining to the training of security contractor personnel, the policy of exposing civilian contractors to security threats in Iraq and thereby necessitating their protection, and the suitability of tactics used by security contractors to evade or eliminate security threats. All of these issues relate to the United States' foreign policy and military objectives of reconstructing Iraq, and the Constitution vests the power to determine such issues in the executive and legislative branches, not the judiciary. The first prong of the *Baker* analysis is likely the most important. *Vieth*, 541 U.S. at 278. Accordingly, the

20

plaintiffs' claim against a contractor hired by a political branch of the federal government, and involving alleged negligence in the performance of that contractor's duties in a war-zone, implicates a political question and does not present a justiciable controversy under Article III of the Constitution.

B.   *Baker v. Carr* Factor Two–A decision in this case requires a review of the reasonableness of the defendant driver in an active combat zone and presents a clear lack of judicially discoverable and manageable standards for resolving the claim.

The political question doctrine applies in this case because no judicially discoverable or manageable standards are available to resolve the questions presented. This case involves an accident that took place on a dangerous highway in a war zone. It is not a typical car crash on a U.S. interstate highway. There are no specific rules or regulations pertaining to contractor's speed or manner of travel. Plus, there is the constant possibility of roadside attacks. As stated by Judge Land, in *Whitaker*, "[t]he question here is not just what a reasonable driver would do–it is what a reasonable driver in a combat zone, subject to military regulations and orders, would do. That question necessarily implicates the wisdom of the military's strategic and tactical decisions, a classic political question over which this Court has no jurisdiction." 2006 WL 1876922 at *3.

The Supreme Court, and numerous other courts, have agreed with Judge Land's take on this situation: "It is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments." *Gilligan*, 413 U.S. at 10. *See also Atkepe*, 105 F.3d at 1404 (finding that issues of military policy require "a complex, subtle balancing of many technical and military considerations, including the trade-off between safety and greater combat effectiveness. . . . Courts will often be without knowledge of the facts or standards necessary to assess the wisdom of the balance struck.") (internal citation omitted); *Zuckerbraun v. General Dynamics Corp.*, 755 F.Supp. 1134, 1142 (D. Conn. 1990) (quoting *Rappenecker* below)*; Rappenecker v. United States*, 509 F.Supp. 1024, 1030 (N.D. Cal. 1980) ("[C]ourts lack standards with which to judge whether reasonable care was taken to achieve tactical objectives in combat while minimizing injury and loss of life.").

Just as in *Whitaker*, the plaintiffs in this case ask this Court to review the policy of contractors performing a task that otherwise would be undertaken by the United States military. The proper question here is the same as that in *Whitaker*: What would a reasonable driver *faced with the possibility of hostile fire* do under the circumstances? To answer this question would necessarily require review of general military policy, such as the decision to use contractors in dangerous situations, the training of the contractors, the conduct of the military had it undertaken these activities, and the reasonableness of the contractor's response

22

as compared to the reasonable response expected of military personnel in the same situation. Therefore, the plaintiffs are not simply asking the Court to hear evidence in a typical car crash that may occur on an Alabama highway, but are actually requesting that this Court review the policy decisions of the executive and legislative branches, in regard to their control of security activities in Iraq and similar locales. In effect, the plaintiffs are asking this Court, rather than the Executive Branch, to determine what security tactics are appropriate in a war zone like Iraq.

Neither this Court, nor any court in the United States, has the competency to decide issues related to the conduct of soldiers or contractors performing their duties in the midst of wartime conditions. The tort law is not equipped to provide any court a realistic basis to review the plaintiffs' claims. Accordingly, the second *Baker* factor is implicated by the plaintiffs' claim and that claim is non-justiciable.


C.      *Baker v. Carr* Factor Three–This case cannot be decided without an initial
        policy determination of a kind clearly for nonjudicial discretion

To resolve this matter would require the Court to make policy decisions reserved for the discretion of the United States executive and legislative branches. "The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments." *Gilligan*, 413 U.S. at 10. Any judicial determination of military or foreign policy matters, such as the choice to employ

independent contractors to perform certain tasks, would require a review of the policy of the executive and legislative branches.

The CPA elected to hire independent contractors to perform general security tasks for other contractors at work in Iraq on the OFF program. The PCO and OST elected to continue this arrangement to help their aid programs. The purpose of hiring DI and other security services was to protect those contractors attempting to reconstruct Iraq, a recognized military and foreign policy objective of the United States. For this Court to review the actions of these contractors would entail a review of the choice of the U.S. government to support the OFF and subsequent aid programs and its choice to allow the CPA, PCO and OST to hire independent contractors to provide security. Those branches of government with more expertise in these areas, and with the Constitutional mandate to perform these tasks, have already made this decision, and it is not the place of the judicial branch to question those determinations. *See Gilligan*, 413 U.S. at 8 (training, equipping and controlling military forces is best left to trained professionals under the control of responsible civilian authorities); *Aktepe*, 105 F.3d at 1404 (rejecting the ability of the courts to review military policies involved in NATO training session); *Smith*, 4:06-0462-H, at p. 17-18 (declining jurisdiction because military policy involved with the feeding of soldiers would have to be reviewed to hear the claims).

Entertaining the claims of the plaintiffs' require this Court to make initial findings as to the reasonableness of certain military and government policies, specifically the decision

to reconstruct Iraq in the face of armed resistance through the use of private security companies. In order to make a determination of the plaintiffs' claims, this Court would have to review the policies of its coordinate branches of government better suited for non-judicial review. Therefore, this Court should find the plaintiffs' claims to be non-justiciable, as those claims raise a political question better suited to be answered by elected officials.

> D.     _Baker v. Carr_ Factor Four–Those branches of government with express control of foreign policy and the military have elected to use independent contractors to perform certain tasks and to independently resolve claims necessarily reviewing policies intertwined with those decisions would express a lack of respect due to the coordinate branches of government.

Any action taken by this Court in regard to the plaintiffs' claims may express a lack of due respect for a coordinate branch of government. The CPA, a government-created entity under the partial control of the Department of Defense, contracted with DI to provide security services for other independent contractors working to provide support to the OFF program in Iraq. This arrangement continued through the PCO even after the OFF program was discontinued. DI's responsibility was to perform its contractual duties to the CPA, PCO and OST, as it was instructed to do in its contracts. Accepting jurisdiction over this case would involve review of the foreign policy and military affairs decisions of the executive and

25

legislative branches. *See Atkepe*, 105 F.3d at 1404 ("The interjection of tort law into the realms of foreign policy and military affairs would effectively permit judicial reappraisal of judgments the Constitution has committed to the other branches."). *See also Tiffany*, 931 F.2d at 278 (Fourth Circuit reversed trial court and refused federal jurisdiction over claim involving national policy regarding interception of aircraft in U.S. airspace because, in part, the trial court could not "undertake independent resolution without expressing lack of the respect due coordinate branches of government") (citation omitted); *In re Korean Air Lines Disaster of September 1, 1983*, 597 F.Supp. 613, 616 (D.D.C. 1984) (for a court to review a decision affecting national security would "certainly evince 'a lack of respect due coordinate branches of government'").

Deciding the plaintiffs' claims would place the judicial branch, and this Court, in the compromising position of overseeing the other two branches of government in an area where the Constitution expressly grants the power to the executive and legislative branches. *Id.* Accordingly, deciding the plaintiff's claims would force this Court to express a lack of respect due its coordinate branches of government. Thus, the claims of the plaintiffs involve a political question and are non-justiciable.

**V.    The plaintiffs' claims fall squarely under the political question doctrine, as the majority of the *Baker v. Carr* factors are implicated, and no common exception applies to make those claims justiciable.**

26

The plaintiffs will likely couch their claims in terms of an everyday, ordinary car accident and will attempt to distinguish *Whitaker* and *Smith* based on the fact that DI contracted with the CPA and PCO rather than the United States military services. However, these arguments would have no merit. Just as in *Whitaker*, any auto accident which occurs in a war zone, while a government contractor is acting on behalf of the U.S. government, calls for a decision into what a reasonable driver would have done in a war zone and involves situations not contemplated by everyday tort law here in the United States. *See id.*; *Whitaker*, 2006 WL 1876922 at *3; *Smith*, 4:06-0462-H, at p. 16-17.

It is true that not every case or controversy which "touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211. For instance, in *Japan Whaling Association*, the Supreme Court held that the question of interpreting the International Convention for the Regulation of Whaling, including the Pelly and Packwood Amendments, was not outside of the judicial realm. 478 U.S. at 230. However, that holding was specifically premised upon the role of the judiciary in the scheme of the Constitutional separation of powers amongst the branches of government; i.e., it is a distinctly judicial function to review and interpret statutes and the judiciary "cannot shirk [that] responsibility merely because [its] decision may have significant political overtones." *Id. See also Gercey v. United States*, 540 F.2d 536, (1st Cir. 1976) (affirming dismissal of plaintiff's claims for wrongful death of her son which were premised upon the Coast Guard's alleged negligence); *In re Korean Airlines Disaster*, 597 F.Supp. At 617 (plaintiffs' claims that the U.S.

government could have taken additional action to protect the passengers of the plane were not actionable as they did not allege negligence based upon "imperfectly executing a federal program established either by an act of Congress or federal regulation.").

The facts of this case present a question similar to that in *Gercey* and *Korean Airlines*; to wit, a claim that there should be a duty upon the defendant and the defendant breached that hypothetical duty. This is distinctly different from *Japan Whaling Association*, in which a statute provided a duty and the plaintiffs merely alleged a breach of that duty. The plaintiffs in this action allege that an independent contractor working on behalf of the governing body of Iraq at that time committed negligence. There is no federal statute that this Court is asked to interpret. The plaintiffs' claim is purely based in state common law. Accordingly, the political question doctrine should be invoked and this Court should find that the plaintiffs' claim presents a non-justiciable controversy and refuse to exercise jurisdiction.

## Summary

DI performed security services in Iraq through contracts with the CPA, and then the PCO and was providing these services at the time of the accident. Any review of the actions of DI would be akin to a court reviewing the actions of the CPA and the PCO, the executive branch of the U.S. government that created those entities, or even the military. Thus, the claims of the plaintiffs involve political questions better decided by the legislative or executive branches of the federal government.

WHEREFORE, Defendant DynCorp International LLC prays that this Court will allow its motion to amend its answer to assert the affirmative defense of lack of subject matter jurisdiction and the defendant further requests that this Court decline to exercise jurisdiction in this action due to the presence of political questions the Court would be required to answer in hearing this case.

Respectfully submitted,


By:___ /s/  Wm. Steele Holman II____
William Steele Holman II
Bar Number: HOL051
John W. Clark IV
Bar Number: CLA087
Attorneys for defendants James McCants
and DynCorp International LLC
Armbrecht Jackson LLP
Post Office Box 290
Mobile, Alabama 36601
Telephone:    (251) 405-1300
Fax:            (251) 432-6843
E-mail:        wsh@ajlaw.com
                jwc@ajlaw.com


Of Counsel:                        William Larkin Radney III
                                   Bar Number: RAD001
                                   Barnes & Radney PC
                                   P.O. Box 877
                                   Alexander City, Alabama 35010-0877
                                   (256) 329–8438 (voice)
                                   (251) 329-0809 (fax)
                                   lradney@bellsouth.net

## CERTIFICATE OF SERVICE

I certify that on September ___, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Larry W. Morris
kbaker@morrishaynesandhornsby.com
Nancy L. Eady
neady@morrishaynesandhornsby.com

William Larkin Radney III
lradney@bellsouth.net


By____/s/ John W. Clark IV_____

# 464794