IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| JOHNNY POTTS and JANICE POTTS, <br>     PLAINTIFFS, <br><br> v. <br><br> DYNCORP INTERNATIONAL, LLC, <br> JAMES MCCANTS, et al., <br>     DEFENDANTS. | CIVIL ACTION NO. <br> CV-3:06-00124-WHA-CSC |

**BRIEF OPPOSING DISMISSAL FOR LACK OF JUSTICIABILITY**

Come now the Plaintiffs, by and through the undersigned counsel, and file this brief stating why this case should not be dismissed on the grounds of non-justiciability under the political question doctrine.

### I.   PARAMETERS OF THE POLITICAL QUESTION DOCTRINE

The Defendants have raised the issue of the political question doctrine in the context of the instant case.  Technically, the political question doctrine is not an issue of subject matter jurisdiction, but instead revolves around the issue of separation of powers under the United States Constitution.  As one trial court has explained the issue:

> The Supreme Court has explained the significant difference between [the grounds for dismissal of lack of subject matter jurisdiction and nonjusticiability]:
>
> > i]n the instance of nonjusticiability, consideration of the cause is not wholly and immediately foreclosed;  rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded.   In the instance of

1

> lack of jurisdiction the cause either does not 'arise under' the Federal Constitution, laws or treaties (or fall within one of the other enumerated categories of Art. II, § 2), or is not a 'case or controversy' within the meaning of that section; or the cause is not one described by any jurisdictional statute.

*Baker v. Carr*, 369 U.S. 186, 198, 82 S.Ct. 691, 699, 7 L.Ed.2d 663 (1961).

*Zuckerbraun v. General Dynamics Corp.*, 755 F. Supp. 1134, 1136 FN. 1 (D. Conn. 1990).

In other words, "the political question doctrine serves to prevent the federal courts from intruding unduly on certain policy choices and value judgments that are constitutionally committed to Congress or the executive branch. ... The determination of whether a lawsuit raises a political question depends upon 'a discriminating analysis of the question posted, in terms of the history of its management by the political branches, of its susceptibility in the light of its nature and posture of the specific case, and of the possible consequences of judicial action." *Koohi v. United States*, 976 F. 2d 1328, 1331 (9th Cir. 1992).

> The political question doctrine may lack clarity...but it is not without standards. At least one of the following must be 'inextricable from the case at bar' to implicate the doctrine:
>
> 1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
>
> *Baker,* 369 U.S. at 217, 82 S.Ct. 691; *see also Vieth v. Jubelirer,* 541

U.S. 267, 277-78, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004) (citing the six *Baker* tests and noting that 'these tests are probably listed in descending order of both importance and certainty').

*Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 15 (D.D.C. 2005).

However, 'it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Abebe-Jira v. Negewo*, 72 F. 3d 844, 848 (11th Cir. 1996). Moreover, "tort suits brought by civilian plaintiffs are clearly within the judicial system's expertise," as opposed to tort suits brought on behalf of soldiers, who serve within the Executive Branch. *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1497 (C. D. Cal. 1993). As the *Bentzlin* court observed, "generally, civilians injured at the hand of the military do not raise political questions; soldiers injured at the hands of the military raise political questions." *Id.*

The defendants correctly observe in their brief that at least some courts have extended the political question doctrine to apply to cases where soldiers are injured at the hands of government contractors hired by the military. However, there are other opinions that disagree with this holding; *see, e.g.*, *Carmichael v. Kellogg, Brown & Root Services, Inc.*, — F. Supp. 2d —, 2006 WL 2686770 (N. D. Ga. 2006)[1] & *Lessin v. Kellogg, Brown & Root*, No. H-05-01853, 2006 U.S. Dist. LEXIS 39403 (S. D. Tex. June 12, 2006).[2] However, the defendants have not cited to a single case where the political question doctrine was applied to a case such at the one at bar, between a civilian and a government contractor performing civilian, not military, work.

---

[1] The *Carmichael* case is attached hereto as Exhibit A.

[2] The *Lessin* opinion is attached hereto as Exhibit B.

Given these parameters, the political question doctrine does not preclude the instant action.

## II.    STATEMENT OF FACTS

### A.    THE CONTRACT

Dyncorp International LLC contracted with the Coalition Provisional Authority in November of 2003 to provide security for convoys brining humanitarian assistance into Iraq. (Def. Brief, p. 6). On June 28, 2004, the Coalition Provisional Authority transferred power to a sovereign Iraqi interim government, and the Coalition Provisional Authority was officially dissolved. (Def. Exh. A, GAO Report, Court Doc. 34, p. 9 of 122). Even after the dissolution of the Coalition Provisional Authority, Dyncorp's contract was extended under the authority of the Department of State by the Project and Contracting Office of the U.S. Government. (Def. Brief, p. 6).

The contract both in its original and extended forms contained a number of provisions that are relevant to the instant inquiry. All of the provisions cited herein remained the same throughout the term of the contract. (Def. Exh. D, Court Doc. 33, p. 98 of 103).

The contract made it clear that there would little or no United States government, including military, involvement or funding in the contract's performance. The contract required Dyncorp to "provide all personnel, equipment, training and management necessary to secure the ...goods being hauled into the country of Iraq from all the border crossings for Turkey, Syria, and Jordan and the port of UMM Qasr." (Def. Exh. D, Court Doc. 33, pp. 25, 49, 68 of 103). It required Dyncorp to provide to the Ministry

of Trade "a detailed work plan," which would "outline how to accomplish the tasks [required in the contract] as well as outlining necessary major equipment acquisitions, subcontracts and operational issues..." (*Id.*, p. 50 of 103). The contract further stated that the Coalition Provisional Authority would only provide "office space and security for the operation center," and that "the obligation under this contract is made with ***Iraqi funds***...***No funds, appropriated or other, of any Coalition country are or will be obligated under this contract.***" (*Id.*, ¶ 40, Source of Funds, p. 59 of 103). (Emphasis added.)

The contract and the proposal indicated that Dyncorp would be responsible for determining the procedures used to implement it. As part of the "Technical Proposal Overview" submitted by DynCorp to the CPA, Dyncorp stated that its key management team roles and responsibilities included an "operations support manager", who was "responsible for the day-to-day execution of security services at all sites including on-demand convoy escort guard services." (Def. Exh. D, Court Doc. 33, p. 28). As part of its proposal, DynCorp explained its quality control plan to the Provisional Coalition Authority in the following terms:

> To direct and control our Quality program we will use;
>
> *Standard Operating Procedures* (SOPs): These procedures will be used **to clearly define** duties, responsibilities, **specific methodologies, and directions for personnel performing specific tasks.** They provide company-approved procedures and work instructions.

(Emphasis added.) (*Id.*, Court Doc. 33, pp. 36-37 of 103). (Emphasis added).

Also as a condition of the contract, Dyncorp was required to "provide and maintain work environments and procedures which will ... (1) Safeguard the public and

governmental entity personnel, property, materials, supplies and equipment exposed to Contractor operations and activities..." (Def. Exh. D, Court Doc. 33, p. 63 of 103).

Also as part of its contract, Dyncorp agreed that it was an independent contractor, and that its employees "will not be considered government employees for any purpose." (Def. Exh. D, Court Doc. 33, p. 58 of 103). It further agreed that it was "responsible for the professional and technical competence of its employees" and that it would "select reliable individuals" who would "perform effectively in the implementation of this Contract..." (*Id.*).

The contract contemplated tort liability on the part of Dyncorp in the performance of the contract as Dyncorp also agreed that it would "defend, indemnify and hold harmless all government entities involved in this contract, together with the entities' officers, agents and employees from and against all suits claims or liabilities of any kind arising out of acts or omissions of the Contractor, its employees, or the Contractor's subcontractors." (*Id.*) Dyncorp also contracted to "hold and save the government entity awarding this contract, its officers and agents, free and harmless from liability of any nature occasioned by the Contractor's performance." (*Id.*, p. 63 of 103).

As part of the contract, Dyncorp agreed to establish a Command and Control Cell. Its duties were to "manage, support and coordinate with each border entry Liaison Team and the CPA all convoys entering the borders." (Def. Exh. D, Court Doc. 33, p. 29 of 103). The Command and Control Center was to "coordinate with the Liaison Teams the number of support teams required, security escort configuration, departure time of the convoy from the border and estimated time of arrival at destination point, the final destination, check-in points along the convoy route, rally points in case of

problems, continuous tracing of the convoy and possible safe-haven sites for additional security support in case of hostility." (Def. Exh. D, Court Doc. 33, p. 29 of 103). The only governmental involvement with the Command and Control Center specified in the contract was that the "CCC will brief [Ministry of Trade/Coalition Provisional Authority representatives on] convoy plans of execution, and periodic updates while the convoy is in transit in Iraq until the convoys reach their release point at the final destination." (*Id.* pp. 29-30 of 103). Paragraph 3.6 of the contract similarly provided that "[t]he Contractor is to ***provide and staff*** a command and control cell responsible for coordinating with each border entry point team and to coordinate convoys with the CPA operation center." (*Id.*, p. 51 of 103). (Emphasis added).

The GAO report on Iraq indicates that prior to October of 2004, over a month after the incident in which Mr. Potts' leg was injured occurred, there was no formal coordination between the military and private security providers. The report notes in pertinent part the following:

> The military and the private security providers in Iraq have an evolving relationship based on cooperation and coordination of activities and the desire to work from a common operating picture. ***However, U.S. Forces in Iraq do not have a command and control relationship with private security providers or their employees.*** Initially, coordination between the military and private security providers was informal. However, since the advent of the Reconstruction Operations Center *in October, 2004*, coordination has evolved into a structured and formalized process. ...
>
> According to CENTCOM officials and military personnel who have been stationed in Iraq, ***U.S. military forces in Iraq do not have a command and control relationship with private security providers or their employees.*** According to a DOD report on private security providers working in Iraq, ***U.S. military forces in Iraq have no command and control over private security providers because neither the combatant commander nor his forces have a contractual relationship***

7

> ***with the security providers***.  Instead, military and security provider personnel who served in Iraq described a relationship of informal coordination, where the military and private security providers meet periodically to share information and coordinate and resolve conflicts in operations. ...
>
> Coordination between the military and the private security providers has evolved from an informal coordination based on personal relationships to a more structured, although voluntary, mechanism established by the Project and Contracting Office (PCO).

Def. Exh. A, GAO Report, Court Doc. 34, pp. 76-77 of 122.  (Emphasis added).

These contract excerpts and the GAO's assessment of the security provider services both demonstrate that the Dyncorp contract was simply a civilian contract to provide non-military security services to non-military personnel for the purpose of delivering non-military supplies.  Accordingly, the contract does not raise the separation of power issues claimed by Dyncorp in its defense.

## II.   THE INCIDENT

Johnny Potts suffered severe injuries to his leg on September 3, 2004 when he was involved in a one-car automobile accident in Iraq, near the city of Trebil at the Jordanian border.  The driver of the automobile was James McCants.  The purpose of the convoy was to install a high-frequency radio station, called a CODAN radio station, for the use of Dyncorp and its personnel. (Dep. Potts, pp. 139-140)[3].  The radio traffic on the station was for "basic security stuff", "not like a regular police band radio" but rather for communication.  (Dep. Potts, p. 141).  While the radio could receive all Dyncorp channels, it did not receive the military channels.  (Dep. Potts, pp. 141-142).

---

[3] Excerpts from the deposition of Mr. Potts are attached hereto as Exhibit C.

The personal security detail that escorted Mr. Potts and his co-worker, Ronnie Wood, was made up of Dyncorp personnel and local Iraqi nationals, not United States military personnel. (Dep. Potts, pp. 143-148). Mr. McCants was the leader of the personal security detail on that day. (Dep. Potts, pp. 143-148). In addition, Mr. McCants was listed by DynCorp as its Operations Support Manager in Iraq. (Def, Exh. D, Court Doc. 33, p. 44). While Mr. McCants was a member of the United States Military, he received training in driving, including in evasive maneuvers. (Dep. McCants, pp. 57 - 62)[4]. However, none of that training involved driving at high rates of speed. (Dep. McCants, p. 59-60). Mr. McCants estimated that the fastest speed he ever drove while performing a military duty was 45 miles an hour, which equates to approximately 72 kilometers per hour. (Dep. McCants, p. 61). While Dyncorp provided classroom training to Mr. McCants, it did not provide him with on-the-ground training in driving at high rates of speed. (Dep. McCants, p. 69).

At the time the convoy in which Mr. Potts was injured took place, the speed at which a Dyncorp security detail in Iraq traveled depended in part on the assigned threat level for the day. The highest threat level was red. (Dep. McCants, pp. 75-76). Red alerted a driver to the need to be on high alert the entire trip. (Dep. McCants, pp. 75-76). However, even in a red zone, if "everything was normal," the speeds at which a personal security detail would travel were 70 to 80 km/h, which equates to speeds between 45 and 50 mph. (Dep. McCants, pp. 81-82). If "things became abnormal," the detail would increase its speeds to between 120 and 130 km/h, which equates to

---

[4] Excerpts from the deposition of Mr. McCants are attached hereto as Exhibit D.

speeds between 74 and 80 mph. (Dep. McCants, pp. 82-83). Of course, if things were "heated," that is, if a fire fight was involved, then a driver would drive at whatever speed was necessary to get out of the situation. (Dep. McCants, pp. 82-83).

While the trip from Baghdad to Trebil was uneventful, on the way back from Trebil, the SUV which Mr. McCants was driving started to pass by a truck stop area. (Dep. Potts, p. 169). Mr. Potts noticed the two lead cars in front of the SUV slow down and veer a little to the left in order to avoid a dog coming across the highway. (Dep. Potts, pp. 169-170). Mr. McCants does not agree that there was a dog crossing the highway; instead, he testified that he saw a black object that came out onto the road. (Dep. McCants, p. 109). Either way, Mr. McCants swerved the car to the left also. At the time that he swerved, Mr. McCants was driving the SUV at a speed of 160 km/h, which equates to just under 100 mph, well over the guidelines given by Mr. McCants in his deposition for travel in even an abnormal area in the red zone. (Dep. Potts, pp. 169-170; Dep. McCants, pp. 82-83). Mr. McCants swerved to the left and lost control of the SUV, causing the accident that injured Mr. Potts. (Dep. Potts, pp. 169-171; Dep. McCants, pp. 109-110).

Against this factual backdrop, the instant action does not implicate any of the six factors that make an action non-justiciable under the political question doctrine, and therefore the action should be permitted to proceed.

### III. APPLICATION OF THE SIX FACTORS

Dyncorp claims that this suit implicates four of the six *Baker* factors and therefore the case is nonjusticiable. However, this claim fails.

10

**A. The first *Baker* factor**

The first *Baker* factor that can require an issue to be dismissed as nonjusticiable is when there is a textually demonstrable constitutional commitment of the issue to a coordinate political department.  Dyncorp claims that such a textually demonstrable *constitutional* commitment exists in the instant case because the U.S. Constitution clearly delegates military and foreign affairs to the Executive and Legislative Branch.

However, the case law makes it clear that simply because an issue involves the military or involves foreign affairs, it does not become non-justiciable.  As the Court explained in *Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 15 (D.D.C. 2005):

> The Constitution's allocation of war powers to the President and Congress does not exclude the courts from every dispute that can arguably be connected to 'combat,' as the Supreme Court's rejection of the government's separation of powers argument in *Hamdi v. Rumsfeld,* 542 U.S. 507, 124 S.Ct. 2633, 2645-51, 159 L.Ed.2d 578 (2004), makes clear.  As the Ninth Circuit observed, in an action by heirs of passengers of an Iranian civilian aircraft shot down by the U.S. military during the Iran-Iraq war, 'the fact that an action is 'taken in the ordinary exercise of discretion in the conduct of war' does not put it beyond the judicial power.' *Koohi v. United States,* 976 F.2d 1328, 1332 (9th Cir.1992) (quoting and citing *The Paquete Habana,* 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900), and citing other cases), *cert. denied,* 508 U.S. 960, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993).  An action for damages arising from the acts of private contractors and not seeking injunctive relief does not involve the courts in 'overseeing the conduct of foreign policy or the use and disposition of military power.' *Luftig v. McNamara,* 373 F.2d 664, 666 (D.C.Cir.1967).

Moreover, 'it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Ibrahim*, 391 F. Supp. 2d at 15.

Dyncorp has not established that military decision-making in any way influenced the convoy in which Mr. Potts was injured.  No military personnel were involved in the

11

convoy, it was not at the behest of, nor in conjunction with, the United States military, nor was the convoy taking place to achieve a military objective. According to the terms of Dyncorp's own contract, *Dyncorp* was the entity responsible for designing the standard operating procedures that were to be used in such a convoy, the entity responsible for coordinating the convoy and the entity responsible for hiring the personnel necessary to complete the convoy. As such, this incident simply is not tied strongly enough to either military or foreign policy in order to implicate the first *Baker* factor.

The *Ibrahim* case is instructive on this issue. The *Ibrahim* case involved a suit by former detainees or family members of former detainees at the Abu Ghraib prison in Iraq against private government contractors who were hired to provide interpreters and interrogators to the U.S. military. Unlike the instant case, there was a strong military component to the Abu Ghraib contractors' work in Iraq - they worked alongside with members of the U.S. military at the prison. The allegations against the contractors included claims that the contractors or their agents tortured the prisoners in a number of ways. The contractors raised the non-justiciability of the claims against them as a defense to the action. The trial court disagreed, noting the following:

> Of course this case has some relationship to foreign relations, but 'it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.' ... *see also Japan Whaling Ass'n v. Am. Cetacean Soc'y,* 478 U.S. 221, 230-31, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (allowing lawsuit to force Secretary of Commerce to declare Japan in violation of international whaling agreement); *Comm. of United States Citizens Living in Nicaragua,* 859 F.2d 929 (D.C.Cir.1988) (finding 'troubling' the district court refusal to adjudicate claim of infringement of personal and property rights of U.S. citizens resulting from U.S. funding of Nicaraguan Contras). ... The facts of this case are quite distinct from those found to implicate the political question doctrine in

> *Schneider v. Kissinger,* 412 F.3d 190 (D.C.Cir.2005). There, in a matter intertwined with Cold War decision-making, a former National Security Advisor and the United States itself were sued for the alleged murder and torture of a Chilean general in 1970. *See id.* The Court of Appeals found that the case challenged foreign policy decisions over which the courts have no authority. *Id.* **Here plaintiffs sue private parties** for actions of a type that both violate clear United States policy, *see* First Am. Compl. at ¶¶ 24-28, and have led to recent high profile court martial proceedings against United States soldiers.

*Ibrahim*, 391 F. Supp. 2d at 16. (Emphasis added.)

The court then declined to dismiss the suit on political question grounds.

In the instant case, where a civilian plaintiff is making claims against a civilian contractor and another civilian for actions taken without any military involvement, Dyncorp cannot demonstrate that Mr. Potts' claims against Dyncorp and Mr. McCants have been *textually* committed by *the Constitution* to another branch of government, and the first *Baker* factor is not implicated.

### B. The Second Baker Factor

The second *Baker* factor is implicated when there is a lack of judicially discoverable and manageable standards for resolving the issue before the Court. In the instant case, that claim fails, both as demonstrated by case law and by Dyncorp's own contract.

Dyncorp's contract with the CPA provides that Dyncorp will establish standards by which its performance can be judged as part of its quality control program. If Dyncorp is capable of establishing standards, both in terms of the actions its security personnel should take and in terms of the training its security personnel should receive, then judicially discoverable standards exist, and the second *Baker* factor is not

implicated. In addition, as the Court in the case of *Koohi v. United States*, 976 F. 2d 1328, 1332 (9th Cir. 1992) explained:

> A key element in our conclusion that the plaintiffs' action is justiciable is the fact that the plaintiffs seek only damages for their injuries. Damage actions are particularly judicially manageable. By contrast, because the framing of injunctive relief may require the courts to engage in the type of operational decision-making beyond their competence and constitutionally committed to other branches, such suits are far more likely to implicate political questions. *Compare Gilligan v. Morgan,* 413 U.S. 1, 11, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973) (refusing to take cognizance of a suit seeking judicial supervision of the operation and training of the Ohio National Guard in the wake of the Kent State shootings) *with id.* at 5, 93 S.Ct. at 2443 (suggesting that the court might allow a suit against the national guard for damages) *and Scheuer,* 416 U.S. at 247-49, 94 S.Ct. at 1692-93 (allowing such a suit). In sum, the federal courts are competent to determine both the merits of the plaintiffs' suit and the extent of the relief to which plaintiffs would be entitled.

The *Koohi* court refused to dismiss a lawsuit by the heirs of some deceased passengers and crew of an Iranian civilian aircraft that was shot down by a United States warship, the USS Vincennes, in an incident that occurred during the Iran-Iraq war on the grounds of the political question doctrine.[5] The case of *Lessin v. Kellogg Brown & Root*, No. 05-01853, U.S. Dist. LEXIS (S. D. Tex. June 12, 2006) is much more analogous to the instant case. The *Lessin* case involved a suit for injuries sustained by a soldier, Sean Lessin, when a convoy truck owned and operated by the contractor Kellogg, Brown & Root malfunctioned. When the truck malfunctioned, Sean Lessin went over to assist the driver of the malfunctioning truck. The ramp assist arm for the truck hit him in the head, and he suffered a dramatic brain injury. The defendant

---

[5] The *Koohi* court found that the action was justiciable, but that sovereign immunity precluded the heirs' claims against the United States and the government contractor defense under the 'combatant activities' exception precluded the heirs' claims against the government contractors of the Aegis missile system.

14

in *Lessin* also moved for a dismissal on the grounds of the political question doctrine, and the trial court refused. In doing so, it discussed the second *Baker* factor in the following fashion:

> This Court agrees that, where the military's strategy, decision-making, or orders are necessarily bound up with the claims asserted in a case, the political question doctrine is implicated, and the case is inappropriate for judicial inquiry. Here, however, Plaintiff's claims that Defendant acted negligently are not certain to implicate such topics, or any others that are committed to the political branches. The incident or issue in this case was, essentially, a traffic accident, involving a commercial truck alleged to have been negligently maintained, as well as a civilian truck driver who was allegedly negligent in operating the truck and insufficiently trained. Claims of negligence arising from this type of incident are commonly adjudicated by courts, using well-developed judicial standards.

*Lessin*, p. 5.

Another district court from Georgia agreed with the *Lessin* analysis in the case of *Carmichael v. Kellogg, Brown & Root Services, Inc.*, — F. Supp. 2d —, 2006 WL 2686770 (N. D. Ga. Sept. 19, 2006). In the *Carmichael* case, a United States Army soldier was injured in an accident which put him in a permanent vegetative state. Sergeant Keith Carmichael was serving as a military escort for a convoy of trucks owned and operated by Kellogg, Brown & Root Services, Inc. and Halliburton Energy Services, Inc. He was a passenger in a truck driven by Richard Irvine, an employee of both contractors. Sergeant Carmichael was injured when Mr. Irvine lost control of the tractor-trailer and drove off the road, overturning into a ravine. Sergeant Carmichael, through his wife, claimed that Mr. Irvine was negligent in operating the tractor-trailer at an excessive speed and failing to maintain control of the tractor trailer. He also claimed that the government contractors were vicariously liable for Mr. Irvine's actions under the

doctrine of respondeat superior and were directly liable for negligent hiring, training and supervision of Mr. Irvine.

As in the instant case, the contractors raised the defense of non-justiciability under the political question doctrine. The trial court, however, refused to dismiss the case, saying the following:

> The Court has reviewed the cases cited by the parties, as well as several other authorities, and concludes that the Court in *Lessin v. Kellogg, Brown & Root*, No. H-05-01853, 2006 U.S. Dist. LEXIS 39403 (S.D. Texas, June 12, 2006) best states the test for cases in which a member of the U.S. military is injured or killed as a result of the alleged negligence of a government defense contractor working with the military: the plaintiff's claims are barred by the political question doctrine if 'military decision-making or policy would be a necessary inquiry, inseparable from the claims asserted.' ...

*Carmichael*, at 3.

The *Carmichael* court observed that it would be conceivable that "at the time of the accident Defendant Irvine was driving the truck within the speed limit set by the military yet in a manner that was negligent in some other respect. In that event, the political question doctrine would not necessarily bar plaintiff's claims." *Id.* at 3.

In the instant case, there is no evidence that the military was involved at any stage in the convoy, or that it set any of the ground rules to be followed during the convoy. In fact, the evidence is to the contrary - it was Dyncorp that established its own standard operating procedures as part of its contract and Dyncorp that establish its own training methods. Accordingly, even more so than in *Carmichael*, the political question doctrine is not implicated in the instant case.

The issues in this case, whether Mr. McCants' conduct at the time of the accident was negligent or wanton, and whether Dyncorp's failure to provide high-speed

driving training to its security personnel was reasonable, are the type of claims commonly adjudicated by the courts, and the second *Baker* factor is not implicated.

### C. The Third Baker Factor

The third *Baker* factor occurs when it is impossible for a court to decide an issue before it without an initial policy determination of a kind clearly reserved for nonjudicial discretion. Dyncorp claims that the Court's consideration of the plaintiffs' claims in this case would require it to "make initial findings as to the reasonableness of certain military and government policies, specifically the decision to reconstruct Iraq..." (Def. Brief, pp. 24-25). This claim is simply not true. The plaintiffs have not asked this Court to make any rulings on any government policy with respect to Iraq or anything else; all they have asked this Court to do is to decide, through a jury, whether the actions of DynCorp and its employee, James McCants, were negligent or wanton in connection with the accident in which Mr. Potts was injured, and if so, to determine the amount of monetary damages necessary to compensate Mr. and Mrs. Potts. Neither foreign nor military policy are at issue here, and this claim also fails.

### D. The Fourth Baker factor

The final *Baker* factor raised by the defendants as requiring this Court to rule this action non-justiciable is the fourth factor, which is implicated when the issue before the Court is impossible for a court to independently resolve without expressing lack of the respect due coordinate branches of government. This claim fails also, because the Potts are not asking this Court to review the actions of a coordinate branch of government, but the actions of a civilian contractor and its employee. The cases cited

by the Defendants in their brief are distinguishable because in each of them the primary defendant was not a government contractor but the United States military itself.

For example, the case of *Aktepe v. USA*, 105 F. 3d 1400 (11th Cir. 1997) involved a suit by the survivors on a Turkish destroyer of an accident that occurred in the course of a joint naval exercise between the United States and Turkey. In the course of the exercise, the USS Saratoga fired two live missiles at a Turkish destroyer, killing or injuring over 300 Turkish crew members. The survivors or heirs sued the United States directly, and their suit was dismissed under the political question doctrine. In the instant case, however, the accident did not occur in the course of a military exercise or combat operation and is not against the United States.

The claims in the case of *Tiffany v. United States* , 931 F. 2d 271 (4th Cir. 1991) were inextricably linked to the actions of the United States military in connection with the North American Air Defense Command when a private airplane, who failed to file a flight plan, entered United States air space without clearance and then collided with a United States Air Force jet. By contrast, the instant case only involves the actions of private entities and individuals, not the military.

Similarly, the case of *In re Korean Air Lines Disaster of September 1, 1983*, 597 F. Supp. 613, 616 (D.D.C. 1984) also involved direct claims against the United States government, as opposed to claims against a private contractor.

A consideration of the Potts' claim by this Court will not demonstrate a lack of respect for the other branches of government, and accordingly, this *Baker* factor fails as well.

E.  *Whitaker* and *Smith*

The two cases on which the Defendant most heavily relies, *Whitaker v. Kellogg, Brown & Root, Inc.*, 444 F. Supp. 2d 1277 (M.D. Ga. 2006) and *Smith v. Halliburton Co.*, CV No. 4:06-0462-H (S. D. Tex. Aug. 30, 2006) are distinguishable from the instant case. In addition to the rejection of the reasoning expressed in these two cases by the trial court in the case of *Carmichael v. Kellogg, Root & Brown, Inc.*, — F. 2d —, 2006 WL 2686770 (N.D. Ga. Sep. 19, 2006), the cases are distinguishable factually. In both cases, the injured person was a member of the military at the time of the injury. In this case, both the injured party and the alleged tortfeasors are civilians. In addition, the military involvement in the *Whitaker* and *Smith* incidents was far more substantial than in the instant case.

The *Whitaker* case involved a service member killed while he was escorting a *military supply* convoy operated by Kellogg, Brown & Root. As the trial court observed:

> The convoy operation was planned by the military, which determined the placement of vehicles in the convoy, the speed of the convoy, and the distance between vehicles in the convoy.

*Whitaker*, at 1282. In the instant case, the convoy operation was planned by Dyncorp, which determined the placement of vehicles in the convoy, the speed of the convoy and the distance between the vehicles in the convoy.

Similarly, the *Smith* case involved service members who were killed when a suicide bomber walked into a military mess hall in Mosul, Iraq and detonated explosives packed with ball bearings. The suit was against the contractors providing food service to the mess hall. However, the contract under which the contractors were operating

19

provided that the military, not the contractors, were responsible for providing security to the mess hall. *Smith*, p. 7. By contrast, in the instant case, Dyncorp was responsible for planning the security involved in the convoy.

## CONCLUSION

For all of the foregoing reasons, the plaintiffs respectfully request that this Court refrain from dismissing this action under the political question doctrine.

Respectfully submitted on this the 6th day of October, 2006.

**MORRIS, HAYNES AND HORNSBY**

/s Larry W. Morris
LARRY W. MORRIS
Attorney for Plaintiffs
MOR007

Post Office Box 1660
Alexander City, Alabama 35011-1660
Telephone: 256-329-2000
Facsimile: 256-329-2015

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing in the above referenced case on the 6th day of October, 2006 by filing the same electronically with the Clerk of the Court using the CM/ECF system which will send notification of the same to all attorneys of record.

/s  Larry W. Morris
Of Counsel