IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| JOHNNY POTTS and JANICE POTTS, | § | |
| Plaintiffs, | § | |
| | | Civil Action No. |
| v. | § | |
| | | 3:06-cv-00124-WHA-CSC |
| DYNCORP INTERNATIONAL LLC, | § | |
| JAMES McCANTS, et al., | | |
| | § | |
| Defendants. | | |

DEFENDANT DYNCORP INTERNATIONAL LLC'S
REPLY BRIEF IN SUPPORT OF MOTION TO AMEND ANSWER
TO ASSERT DEFENSE OF LACK OF SUBJECT MATTER JURISDICTION

COMES NOW defendant DynCorp International LLC ("DI") and submits this reply brief in support of its motion to amend its answer to the plaintiffs' complaint to assert the defense of lack of subject matter jurisdiction. DI respectfully requests that this Court decline to exercise jurisdiction over this matter because it is a non-justiciable controversy under the "political question" doctrine.

## UNDISPUTED FACTS

The plaintiffs agree that DI's contract was originally with the Coalition Provisional Authority ("CPA"), in which the United States government took the leading position, and, following the transfer of power from the CPA to a sovereign Iraqi government, the contract was extended under the authority of the Department of State by the Project and Contracting

Office ("PCO") of the United States government.[1] (Plaintiffs' Brief Opposing Dismissal for Lack of Justiciability, hereinafter "Plaintiffs' Brief," p. 4). This contract gave DI some discretion in carrying out its contractual duties, but required DI to provide the Ministry of Trade, a division within the CPA, a "detailed work plan" regarding its contractual operations. (Plaintiffs' Brief, p. 5). DI further provided a "Technical Proposal Overview" to the CPA describing its managerial roles and including a quality control plan. (Plaintiffs' Brief, p. 5).

DI was required to establish a Command and Control Center ("CCC") to "manage, support and coordinate with each border entry Liaison Team and the CPA all convoys entering the borders." (Plaintiffs' Brief, p. 6)(our emphasis). The CCC was required to brief the contracting entity on DI's plans to execute each mission, along with periodic updates on the progress of convoys during the mission. (Plaintiffs' Brief, p. 7).

These facts, as stated and taken from the Plaintiffs' Brief, are not disputed.

## CORRECTIONS OF MISSTATED FACTS BY THE PLAINTIFFS

The plaintiffs' response also contains certain statements and alleged "facts" that are incorrect and, more importantly in some cases, statements that are not facts but legal arguments.

---

[1] The CPA and PCO will at times be referred to as "the contracting entity" or "the contracting entities."

I.     **The contract between DI and the CPA/PCO does not anticipate or contemplate tort actions such as this case or agree that such a case as this is justiciable in a domestic United States court of law.**

The plaintiffs contend that DI's contract with the CPA and PCO "contemplated tort liability on the part of [DI] in the performance of the contract as [DI] also agreed that it would 'defend, indemnify and hold harmless all government entities involved in this contract, together with the entities' officers, agents and employees from and against all suits claims or liabilities of any kind arising out of acts or omissions of the Contractor, its employees, or the Contractor's subcontractors.'" (Plaintiffs' Brief, p. 6). The contract also contained a clause whereby DI released the contracting entity from any liability it may incur as a result of DI's performance under the contract. (Plaintiffs' Brief, p. 6).

While the language of the contract is factual in nature, the plaintiffs go beyond merely stating the language of the contract and assert that such language "contemplated tort liability." First, this is a legal assertion and inappropriately located in a section entitled "Statement of Facts." Second, it is an incorrect legal conclusion.

This language is a standard "boiler-plate" indemnity language. Those clauses merely contemplate that if an action were brought the government for some act of DI, then DI would defend the action at its cost and pay any judgment rendered against the government. The plaintiffs want this Court to read this language as an agreement by DI that it is subject to tort liability under the facts in this case. That language cannot be understood as an agreement by DI that Alabama tort law can provide a standard of care for a security convoy in the Iraqi

3

desert, or that DI is precluded from asserting any applicable defenses, including lack of subject matter jurisdiction or the lack of constitutional justiciability of any claim. That language also cannot be read as suggesting that DI believes domestic courts of law should be deciding the appropriate tactics security convoys should use when encountering security threats.

In addition, the language quoted by the plaintiffs pertains to duties between the two contracting parties–DI and the contracting entities. That boiler-plate language has absolutely nothing to do with the propriety of a suit, by a party not privy to the contract, against the U.S. government, the contracting entities, DI, or any other party. The quoted clauses are merely an indemnification provision and a hold harmless provision that may be applied if the *contracting entity* happened to be sued arising out of the contract with DI.

## II.    The contracting entities dictated the requirements of the contract and DI merely provided the contracting entity with its day-to-day plan to carry out those requirements.

The plaintiffs' discussion of the contractual interaction between DI and the CPA/PCO overplays DI's autonomy in carrying out its contractual duties to the contracting entity.

DI submitted a proposal to the CPA in response to the "Statement of Work" issued by the CPA. (Affidavit of David M. Moore ¶ 4 ("Moore Aff.") at Doc. 33, p. 20; Moore Aff. Exh. B at Doc. 33, p. 50-64). The Statement of Work specifically explained the nature of the work required under the contract and called for DI to provide the CPA "a detailed work plan"

within five days of being awarded the contract. (Moore Aff. Exh. B at Doc. 33, p. 50). Once awarded this contract, DI provided the CPA with the appropriate documentation and plans. (Moore Aff. Exh. A at Doc. 33, p. 24-45). The plaintiffs' brief provides a detailed explanation of a number of the provisions of the contract and those provisions are indeed found in the contract. (Plaintiffs' Brief, p. 4-7). However, the plaintiffs neglect to mention that the Statement of Work required DI to provide these details in order to fulfill the overall goals of the contract, as set out by the contracting entity. (*See* Moore Aff. Exh. B at Doc. 33, p. 50).

The Statement of Work further provided that the CPA, through its Ministry of Trade and along with the "Contractor Program Manager," "shall modify the work plan, as required, to document all activities and purchases under this requirement." (Moore Aff. Exh. B at Doc. 33, p. 50). In addition, the Statement of Work required DI to provide convoy teams armed with assault weapons and allocated nearly $600,000 for the purchase of the necessary weapons. (Moore Aff. ¶ 9 & 12; Moore Aff. Exh. B at Doc. 33, p. 49 & 51). The "Standard Terms for Solicitation of Contracts Document," also found in Exhibit B of Moore's affidavit, gave the CPA/PCO's Contracting Officer the power to require DI to remove employees from the contract who may "endanger persons or property, or whose continued employment under this contract is inconsistent with the interest of military security." (Moore Aff. Exh. B at Doc. 33, p. 58).

5

The plaintiffs' description of DI's Iraq activities might lead the Court to conclude that DI just decided to set up a private security organization in Iraq that had no more contact with the government than a similar company operating within the United States. (*See* Plaintiffs' Brief, p. 4-8) (describing the contract as involving "little or no United States government, including military, involvement," stating that "the proposal indicated that [DI] would be responsible for determining the procedures used to implement it," and discussing DI's role as "an independent contractor."). Instead, the contracting entity provided specific instructions that DI was required to implement in its day-to-day operations. (*See* Moore Aff. Exh. B at Doc. 33, p. 50-64). The "Technical Proposal Overview" provided to the CPA/PCO by DI is a description of DI's proposal to meet the requirements of the contract and, due to the provision in the Statement of Work allowing the contracting entity to modify the work plan, it can be surmised that this proposal was accepted by the CPA/PCO. Further evidence of the contracting entities' continuing control over DI's actions is the clause allowing the contracting entity to require DI to remove employees if their employment presented any danger or was inconsistent with "military security," (Moore Aff. Exh. B at Doc. 33, p. 58), and the clause requiring the CCC to keep the contracting entity updated on all missions. (Moore Aff. Exh. B at Doc. 33, p. 29-30).

DI was no doubt given some autonomy to carry out its contractual duties; otherwise, there would be no point in hiring an independent contractor. However, the contractual documents clearly spell out DI's duties and responsibilities. The plaintiffs attempt to portray

DI as a "maverick" organization controlled by no U.S. government authority, *see* Plaintiffs'

Brief p. 4-8, but the contracting entity clearly remained intertwined in the actions of all DI

convoys and retained the right to force DI to remove any employees the contracting entity

deemed unfit. DI was an independent contractor under the terms of its agreement with the

contracting entity, but it was still performing its duties as dictated by the contract and the

contracting U.S. government entity, at all relevant times in this action.

Moreover, the contract clearly directed DI to conduct security service in hostile

environments and clearly contemplated that DI would take appropriate actions when faced

with the threat of attack. (Moore Aff. ¶ 9 & 12; Moore Aff. Exh. B at Doc. 33, p. 49 & 51).

Mr. Potts was also well aware of the dangers presented in Iraq. (*See* Deposition of Johnny

Potts, p. 74-49, 101-02, 108-11, 116-17, 124-27, 128-29, 134-35) (Potts testified that he was

aware of the constant danger while in Iraq and testified that he could not leave the hotel

complex in which he was housed without an armed security convoy escort).


### III.    James McCants's deposition testimony is mischaracterized.

Furthermore, the plaintiffs' characterization of the deposition testimony of James

McCants ("McCants") regarding the driving techniques and proper speeds used in Iraq is

quite misleading, but, at the same time, provides a fine example of the lack of judicial

standards available in this matter. The plaintiffs discuss the danger warning system in place

in Iraq and quote McCants as stating "[t]he highest threat level was red" and "[r]ed alerted

a driver to the need to be on high alert the entire trip." (Plaintiffs' Brief, p. 9) (internal citations omitted). These statements are accurate.

However, during McCants's deposition, counsel for the plaintiffs attempted to determine the proper speeds at which vehicles should travel in Iraq. After McCants explained that he could not answer opposing counsel's question regarding the speed of travel in Iraq when the danger level was "red," he proceeded to narrow opposing counsel's question based upon outside factors, such as whether a gun battle was occurring at the time, whether shots were aimed at the convoy at the time, whether cars were exploding around the convoy at the time, and whether he was traveling inside or outside Baghdad. (McCants Depo. p. 80-81). McCants was attempting to answer the question while at the same time trying to get across his point that there is no answer to the question. McCants repeatedly explained that speed was dictated only by the perceived severity of the danger and that danger was present at all times in Iraq. (*See* Deposition of James McCants, p. 74-83, 137-38).

More importantly, this exchange exemplifies the lack of judicial standards available to this Court in any attempt to measure the defendants' actions against some "reasonable" standard. Ms. Eady questioned McCants in the hope of deciphering a standard or guideline that he and DI neglected to follow. However, McCants struggled to answer her questions regarding a standard or guideline for driving speeds. Later in the deposition, he explained that his driving speed was based purely upon "the situation depending upon the severity at the time" and he had to react based upon that situation and his surroundings and any other

8

suspicious or dangerous activity that occurred during the mission. (McCants Depo. p. 137-38).

This case does not involve a run-of-the-mill automobile accident. On the contrary, it took place under threatening circumstances in a war-torn country with no discernable criminal law or civil tort law. The law of neither Alabama nor Georgia, nor any other state should be held to provide a judicial standard for weighing the defendants' conduct under these facts.

## RESPONSIVE ARGUMENT

I.     *Baker v. Carr* **Factor One–The control of military and foreign affairs is explicitly committed to the political branches of the federal government.**

The plaintiffs focus on the fact that the military was not intimately involved with the day-to-day operations of DI's contract with the CPA/PCO. However, the political question doctrine is not limited to instances in which military policy is in question, but to any situation in which the executive or legislative branches of the federal government are empowered to act by the Constitution. *Japan Whaling Ass'n v. American Cetacean Soc.*, 478 U.S. 221, 230 (1986); *Haig v. Agee*, 453 U.S. 280, 292 (1981); *Atkepe v. United States*, 105 F.3d 1400, 1403 (11th Cir. 1997). Foreign affairs is one of those areas. *See* U.S. Const. art. I, § 8, cls. 11-16; U.S. Const. art. II, § 2.

The plaintiffs' reliance upon *Ibrahim v. Titan Corp.* is also misplaced. (*See* Plaintiffs' Brief, p. 11-13). *Ibrahim* involved a suit by former detainees at the Abu Ghraib prison in Iraq. 391 F. Supp. 2d 10, 12 (D.D.C. 2005). The prisoners sought compensation from two

private government contractors allegedly involved in their torture while held captive in the prison. *Id.*

The plaintiffs emphasize the fact that the defendants were private parties, presumably as opposed to government actors. (*See* Plaintiffs' Brief, p. 11-13). However, it is not disputed that the political question doctrine may apply to private parties. *See, e.g., United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990); *Whiteman v. Dorotheum GmbH & Co. KG*, 2005 WL 3117196 (2nd Cir. 2005); *Fisher v. Halliburton, Inc.*, 2006 WL 2795720, *3 (S.D. Tex. Sept. 27, 2006); *Doe v. State of Israel*, 2005 WL 3037142 (D.D.C. 2005); *In re African-American Slave Descendants Litigation*, 375 F. Supp. 2d 721 (N.D. Ill. 2005); *Bentzlin v. Hughes Aircraft*, 833 F.Supp. 1486 (C.D. Cal. 1993); *Zuckerbaum v. General Dynamics Corp.*, 755 F.Supp. 1134 (D. Conn. 1990); *Nejad v. United States*, 724 F.Supp. 753 (C.D. Cal. 1989). The *Ibrahim* court's decision was not based upon the defendants' status as private parties, but rather upon the plaintiffs' claims alleging an intentional *violation* of United States policy. *Ibrahim*, 391 F. Supp. 2d at 16.

The facts of this action are distinctly different. The plaintiffs in this matter do not allege any violation of United States policy and do not make any claims of an intentional violation of such policy. On the contrary, by all indications McCants and DI were performing their duties as required under the contract with the CPA/PCO. McCants acted in response to circumstances constituting a recognized security threat, i.e., a number of vehicles parked alongside a highway. There is no indication that McCants or DI acted

10

contrary to their contractual responsibilities to the CPA/PCO, and the plaintiffs have not claimed that any actions of the defendants were contrary to U.S. policy.

The undisputed facts show that DI contracted with the CPA, and then the PCO, to provide security for programs designed to rebuild Iraq. The CPA was the interim governing authority in Iraq and was administered through the Department of Defense. (Moore Aff. ¶ 3; Moore Aff. Exh. B at Doc. 33, p. 24-64; Government Accountability Office, Report to Congressional Committees, Pub. No. GAO-05-876, <u>REBUILDING IRAQ Status of Funding and Reconstruction Efforts,</u> p. 5 (2005) ("GAO Reconstruction Report")). The PCO is a U.S. government entity operated by the Department of Defense but under the authority of the Department of State. (Moore Aff. ¶ 19; GAO Reconstruction Report, p. 4).

As discussed in DI's original Brief, the rebuilding of Iraq is "a national security and foreign policy priority." (GAO Reconstruction Report, p. 1). The CPA and PCO, under their powers through the Departments of Defense and State, elected to use independent contractors to carry out this U.S. policy priority. DI did not merely act as it pleased, but instead prepared a detailed proposal to the contracting entities for meeting the contract requirements. The ultimate choice of policy and procedure lay with the CPA and the State and Defense Departments. DI simply acted as a tool for putting this national security and foreign policy into effect.

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed

11

for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n*, 478 U.S. at 230. In order to arrive at a judicial resolution of this matter, the Court will be forced to review issues pertaining to the proper training of security personnel; the policy of exposing civilian contractors to life-threatening situations in Iraq, thereby requiring additional protection, whether civilian or military; and the propriety of the tactics used by government-contracted security personnel to carry out their duties to protect other civilian contractors. These are all matters previously addressed by the executive branch when contracting with DI and other independent security contractors and are better left in the hands of an elected branch of government. As these matters are specifically granted to coordinate branches of government, the first *Baker* factor is implicated, and this action is non-justiciable under the political question doctrine.

## II.    *Baker v. Carr* Factor Two–This action presents no judicially discoverable or manageable standards for resolving the issues presented.

As discussed above, in regard to counsel for the plaintiffs' attempts to find some duty on the part of McCants to drive at a certain speed, there are no judicially discoverable standards that may be applied to this situation. *See* p. 7-9, *supra*.

In response to the plaintiffs' allegations that the quality control program drafted by DI as a part of its contractual duties provides a performance measuring standard, it is clear that the program was designed by DI as a part of its required contractual duties and has nothing to do with tort liability. The quality control program is intended to help the

contracting entity determine whether DI met its contractual duties and merely states the manner in which DI expected to perform its contractual duties. The plaintiffs fail to state any discernable standard that may be ascertained from the contract between the parties and, therefore, it may be logically determined that they were unable to find such a standard.

The plaintiffs also cite *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992), *Lessin v. Kellogg Brown & Root, Inc.*, CV No. H-05-01853 (S.D. Tex. Houston Div. June 12, 2006), and *Carmichael v. Kellogg Brown & Root Services, Inc.*, 2006 WL 2686770 (N.D. Ga. Sept. 19, 2006), in support of their argument that a judicially defined standard may be applied in this action. (Plaintiffs' Brief, p. 14-15).

The plaintiffs apparently rely on *Koohi* for the proposition that seeking damages is less intrusive than seeking an injunction. (Plaintiffs' Brief, p. 14); *see* 976 F.2d 1328 (9th Cir. 1992) (suit arising from claims of relatives of passengers on Iranian civilian airliner shot down by U.S. forces in the midst of the Iran-Iraq conflict). While the *Koohi* court did find that an action for damages is less likely to invoke an issue of justiciability than a similar suit for injunctive relief, it did not wholly rely on that finding alone. 976 F.2d at 1331. Instead, the *Koohi* court cited two other cases in which the plaintiffs claimed they were injured by actions of the military and those courts found the matters were justiciable. *See id.*, citing *The Paquete Habana*, 175 U.S. 677 (1900) and *Scheuer v. Rhodes*, 416 U.S. 232 (1974). The *Koohi* court found those two cases relevant for the holding that "when presented with claims of judicially cognizable injury resulting from **military intrusion into the civilian sector**,

13

federal courts are fully empowered to consider claims of those asserting such injury." *Id.* at 1331-32 (quoting *Laird v. Tatum*, 408 U.S. 1, 15-16 (1972) (emphasis added)). In *Koohi*, *Scheuer* and *The Paquete Habana*, the military intruded into the civilian sector. *Id.* That is clearly not the case presented before this Court. This case is not one in which the military encroached upon the life of an innocent, uninvolved civilian but one in which a plaintiff willingly inserted himself into the midst of a war-zone subject to the corresponding U.S. policy choices related to that war.[2] (*See, e.g.*, Deposition of Johnny Potts, p. 49-56). Therefore, the rationale of *Koohi* does not apply here.

*Lessin* and *Carmichael* both involved accidents occurring outside the scope of the duties of the contractor. *Lessin*, CV No. H-05-01853 (S.D. Tex. Houston Division June 12, 2006); *Carmichael*, 2006 WL 2686770 (N.D. Ga. Sept. 19, 2006). In *Lessin*, a truck had an equipment malfunction and Lessin, a member of the United States Army, attempted to assist the truck's driver. *Lessin*, at p. 1. The ramp assist arm of the truck struck Lessin in the head as he was aiding the driver and injured his brain. *Id.* The court found that military policy, strategy or decision-making were not involved with the accident and, due to the lack of that involvement, the political question doctrine was not implicated. *Id.* at 4-5. However, the court based its decision, at least in part, on the fact that the case was in its early stages of discovery and the facts had yet to be developed. *Id.* at 5.

---

[2] It is interesting to note that when Potts recovered from his broken leg, he *voluntarily went to Afghanistan in June 2006 for the same employer to perform the same duties he had in Iraq.* (Potts Dep. at 229-230).

14

In *Carmichael*, the plaintiff soldier was injured when a truck in which he was a passenger ran off of the road and into a ravine. 2006 WL 2686770 at *1. The driver of the truck was an independent contractor. *Id.* The *Carmichael* court did not distinguish *Whitaker v. Kellogg, Brown & Root, Inc.*, 444 F. Supp. 2d 1277 (M.D. Ga. July 6, 2006), but merely disagreed with that court's decision. *Id.* at *3. The court emphasized that the case was only in its early stages and the facts had yet to be developed. *Id.* The court found that the lack of developed facts prevented it from determining if military decision-making or policy was at issue. *Id.*

The facts of our case are distinguishable, however. There is no indication that the accident was outside the requirements of DI's contractual security functions. DI was required to maintain communications equipment at its border sites, and the accident happened while DI was discharging that duty, i.e., transporting technicians to and from the border site where they had installed or serviced communications equipment. When confronted with a dangerous situation, which appears not to have been present in either *Lessin* or *Carmichael* (at least at that stage of those proceedings), the convoy came under a recognized security threat, and McCants reacted in an attempt to evade a perceived danger arising at the point of the security threat. Attempting to measure the propriety of McCants's actions in this threat situation, while discharging the requirements of DI's contract with the CPA/PCO, is also an indirect review of the policy and decision-making that led all of the parties to this suit into this unfortunate situation.

15

Furthermore, the facts of this matter have been developed and the depositions of the plaintiffs and McCants have already been taken. The rationale of the *Lessin* and *Carmichael* courts, in choosing not to follow *Whitaker* and *Smith v. Halliburton Co.*, CV No. 4:06-0462-H (S.D. Tex Houston Div. Aug. 30, 2006), due to the early stages in which the motions to dismiss were made in *Lessin* and *Carmichael*, is not applicable here.

As shown by their reliance upon *Lessin* and *Carmichael*, the plaintiffs emphasize that military policy was not directly involved with DI's actions at the time of the accident. (Plaintiffs' Brief, p. 16).   However, the fact that the military was not involved is not dispositive. Although the plaintiffs allege that courts commonly hear such claims as these, in order to make the determinations requested by the plaintiffs, this Court would need to examine the decision of the contracting entities, granted their authority from the executive branch, to approve the contract with DI, evaluate the day-to-day operations of DI, as well as determining whether, in far-away war zones, security details fearing for their lives should slow down when approaching recognized threats, contrary to accepted threat avoidance doctrine.

An entity of the executive branch chose to employ independent contractors to provide security services necessary in carrying out the U.S. policy to rebuild Iraq, and its chosen actor, DI, performed according to the contract negotiated by the executive entities.  To determine if DI's actions were negligent or wanton would logically entail reviewing the decisions of the contracting entities, acting under the authority of the executive branch, to use

16

DI and McCants to perform these duties. In addition, as discussed previously, there is no standard by which this Court may determine what conduct on the part of McCants was reasonable under the circumstances presented in this action.

Another district judge in the Southern District of Texas explained this rationale nicely. *See Fisher v. Halliburton, Inc.*, 2006 WL 2795720 (S.D. Tex. Sept. 27, 2006)(copy attached as Exh. I). That suit involved claims by the personal representatives of drivers hired by Kellogg Brown and Root (KBR) to drive transport trucks in Iraq. *Id.* at *1. The drivers were killed in an ambush, and the plaintiffs claimed that KBR intended to send them into a dangerous situation to protect a later convoy. *Id.* While addressing the second *Baker* factor, Judge Miller found that even if the plaintiffs were able to limit their arguments to the actions of the contractor, "eventually the court would be forced to distinguish between [the contractor]'s actions and the Army's actions." *Id.* at *5. Judge Miller refused to enter into that realm, finding that it was outside the purview of the judicial branch. *Id.*

There are no judicially cognizable standards that may be applied to resolve this matter and, accordingly, under the second *Baker* factor, the political question doctrine is implicated and this matter does not present a justiciable controversy for the federal courts.

III.    *Baker v. Carr* **Factor Three–This Court will be asked to make initial policy decisions reserved for non-judicial branches of the federal government.**

While the plaintiffs claim that they "have not asked this Court to make any rulings on any government policy with respect to Iraq or anything else," the Court will be unable to

provide the plaintiffs with the relief they request without reviewing an initial policy decision reserved for a non-judicial branch of the federal government. As discussed above in regard to the second *Baker* factor, in order to find what a "reasonable" person in the place of McCants and DI would have done under the facts presented here would require the Court to enquire into the necessity of the actions of DI and McCants, as well as the danger presented. *See* p. 15-16, *supra*. The Court would inevitably be in the position of dictating proper tactics for U.S. government-contracted security service providers when its drivers are suddenly confronted with obstacles on the road while driving at a high speed in threat circumstances in accordance with prevailing security doctrine in Iraq.

The executive branch has already determined that hiring independent contractors to provide security for the rebuilding of Iraq is necessary. (GAO Reconstruction Report, p. 1). In addition, based on the fact that the contracting entities retained the option to modify DI's proposal, it can be reasonably surmised that the contracting entities accepted DI's terms of operation, thereby implicitly finding that those terms were reasonable. (*See* Moore Aff. Exh. B at Doc. 33, p. 50). These entities, acting on behalf of the executive branch, are the appropriate decision-makers in this area, as military and foreign policy powers are specifically granted to the legislative and executive branches. *See* U.S. Const. art. I, § 8, cls. 11-16; U.S. Const. art. II, § 2.

It is also reasonable to deduce that the contracting entities considered the potential danger to those carrying out the contracts and determined that the operations proposed by DI

were acceptable in light of that danger. In order to grant the relief requested by the plaintiffs, this Court will be forced to find that those policy choices were incorrect. At the least, the Court will have to review those policy decisions to make any determination. Once again, the opinion of the District Court in *Fisher v. Halliburton* describes this issue quite well. "In the broadest sense, the Executive Branch policy of using civilian contractors to free up military personnel for military missions would be under scrutiny. . . . Is it wise to use civilian contractors in a war zone? Was it wise to send the convoy along the route to [Baghdad International Airport] on April 9, 2004? Answering either question and the many questions in between would require the court to examine the policies of the Executive Branch during wartime, a step the court declines to take." 2006 WL 2795720 at *6.

These policy decisions are appropriately left the political branches of government. Accordingly, the third *Baker* factor is implicated by this matter, and it is non-justiciable under the political question doctrine.

IV. ***Baker v. Carr* Factor Four–Any decision in this matter would show a lack of respect for a coordinate branch of government.**

The plaintiffs claim that this factor is not implicated because their suit is against a private corporation. However, the political question doctrine applies to private parties as well as government entities. *See, e.g., United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990); *Whiteman v. Dorotheum GmbH & Co. KG*, 2005 WL 3117196 (2nd Cir. 2005); *Fisher v. Halliburton, Inc.*, 2006 WL 2795720, *3 (S.D. Tex. Sept. 27, 2006); *Doe v. State*

*of Israel*, 2005 WL 3037142 (D.D.C. 2005); *In re African-American Slave Descendants Litigation*, 375 F. Supp. 2d 721 (N.D. Ill. 2005); *Bentzlin v. Hughes Aircraft*, 833 F.Supp. 1486 (C.D. Cal. 1993); *Zuckerbaum v. General Dynamics Corp.*, 755 F.Supp. 1134 (D. Conn. 1990); *Nejad v. United States*, 724 F.Supp. 753 (C.D. Cal. 1989). The plaintiffs present no other argument supporting their position and, therefore, this factor is assuredly implicated and the political question doctrine applies.

In addition, just as discussed above, in order to resolve this matter or provide the plaintiffs with the relief they seek, this Court will be forced to review the actions of an entity controlled by the executive branch choosing to hire independent contractors to provide security services in a war-zone. Reviewing this political choice potentially would show disrespect for a coordinate branch of the federal government, by determining whether certain security tactics, such as bypassing security threats at high speeds, would be allowed. This undertaking implicates the fourth *Baker* factor. The political question doctrine applies and makes this action non-justiciable.

## SUMMARY

DI performed security services in Iraq through contracts with the CPA and PCO and was fulfilling its contractual obligations at the time of the accident made the basis of this action. Any review of the actions of DI would be akin to a court's reviewing the actions of the contracting entities, the Departments of Defense and State, the executive branch of the U.S. government that created and controls those entities, or even the U.S. military. Each of

those organizations played a role in the actions of DI, and each implicitly granted its approval

to the actions of DI in some manner.   Thus, the claims of the plaintiffs involve political

questions better decided by the legislative or executive branches of the federal government.

WHEREFORE, defendant DynCorp International LLC prays that this Court would

GRANT its motion to amend its answer to assert the affirmative defense of lack of subject

matter jurisdiction.  Defendant further requests that this Court decline to exercise jurisdiction

in this action because the claims of the plaintiffs implicate political questions that would be

inappropriate for the Court to consider.


Respectfully submitted,

By:___*/s/ Wm. Steele Holman II*____
William Steele Holman II
(Bar Number:HOL051)
John W. Clark IV
(Bar Number: CLA087)
Attorneys for defendants James McCants
and DynCorp International LLC
Armbrecht Jackson LLP
Post Office Box 290
Mobile, Alabama 36601
Telephone:   (251) 405-1300
Fax:             (251) 432-6843
E-mail:         wsh@ajlaw.com
                    jwc@ajlaw.com

Of Counsel:                              William Larkin Radney III
(Bar Number: RAD001)
Barnes & Radney PC
P.O. Box 877
Alexander City, Alabama 35010-0877
(256) 329–8438 (voice)

(251) 329-0809 (fax)
lradney@bellsouth.net


## CERTIFICATE OF SERVICE

I certify that on October 27, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Larry W. Morris
kbaker@morrishaynesandhornsby.com
Nancy L. Eady
neady@morrishaynesandhornsby.com

William Larkin Radney III
lradney@bellsouth.net


By_____ */s/ W. Steele Holman II* _____

# 468311

# EXHIBIT  G

# FREEDOM COURT REPORTING

Page 1

```
1

      IN THE UNITED STATES DISTRICT COURT
2       FOR THE MIDDLE DISTRICT OF ALABAMA
              EASTERN DIVISION
3
4

   CIVIL ACTION NO.:  3:06CV-00124-WHA-CSC
5
6

   JOHNNY POTTS and JANICE POTTS,
7
             Plaintiffs,            COPY
8

   vs.
9                                    0
   DYNCORP INTERNATIONAL, L.L.C.,
10  JAMES MCCANTS, et al,
11             Defendants.
12

      DEPOSITION OF: JAMES D. MCCANTS
13               10:45 A.M.
              JUNE 13, 2006
15     In accordance with Rule 5(d) of The
16  Alabama Rules of Civil Procedure, as
17  Amended, effective May 15, 1988, I, Cindy
18  C. Goldman, am hereby delivering to
19  Ms. Nancy Eady the original transcript of
20  the oral testimony taken on the 13th day
21  of June, 2006, along with exhibits.
22

23
```

**Exhibit G**

# FREEDOM COURT REPORTING

1   you've asked a tremendous number of

2   questions all in one question.

3        Q.    (By Ms. Eady) Right.  I'm just

4   trying to get a feel for how these

5   vehicles are supposed to move.

6             MR. HOLMAN:  It's hard to tell

7   what you're trying to find out --

8             THE WITNESS:  First question.

9        Q.    (By Ms. Eady) When you've got

10  six vehicles going in a row from Baghdad

11  to one of the perimeter bases, first of

12  all, how fast are they supposed to go?

13       A.    It depends on the threat level

14  of that day.

15       Q.    All right.

16       A.    You would know before you leave

17  base how, you know, the severity of the

18  situation that's going to happen that

19  day.  You've already got your intel

20  reports.  You've already had -- your

21  lookout vehicle went out and did

22  observation of the road or the travel --

23  where you're going to be traveling.  He

## FREEDOM COURT REPORTING

1  would come back, give us a report of

2  there's a group of vehicles that's been

3  parked in this location for two hours.

4      Q.    Uh-huh.

5      A.    It hasn't moved.

6      Q.    Uh-huh.

7      A.    People standing by.

8      Q.    Uh-huh.

9      A.    So, you still have to go through

10  that area.  That tells you right there

11  whether you're going to try to avoid that

12  area or whether you're going to speed up

13  when you're going through that area,

14  different blocking techniques that you'll

15  use to go through that area.

16      Q.    Okay.  What are the different

17  threat levels?  In the United States,

18  we've had the different colors --

19      A.    Yes, ma'am.

20      Q.    -- for a while.  Is it pegged to

21  that, or how do they designate threat

22  levels in Iraq or did they do it at the

23  time you were there?

**FREEDOM COURT REPORTING**

1    A.    Yes, ma'am, they did.  The

2  different threat levels were yellow would

3  have been caution.  Green would have

4  been -- it's a fairly good road to

5  travel.  Red would have been there's

6  danger your whole trip.  Just be on high

7  alert the whole trip.

8    Q.    All right.  So, if it's a green

9  day, what speeds do you go at?

10    A.    A green day, depending on -- I

11  mean, it could be --

12    Q.    Give me a range.

13    A.    I don't really know how to

14  answer that question because just -- I

15  mean, it could be a green day, but as

16  soon as you get outside the gate, then in

17  less than five or ten minutes, it could

18  completely change.

19    Q.    Say the route was green the

20  whole way, what speeds would you go at?

21    A.    The route was green the whole

22  way, maybe -- on average maybe 65 to 70K

23  at the most.

# FREEDOM COURT REPORTING

Page 77

1      Q.    And that's kilometers per hour?

2      A.    Yes, ma'am.

3      Q.    If it's a yellow road the whole

4  way?

5      A.    Once again, I don't really how

6  to answer that question because it's -- I

7  mean, it's never been, you know --

8      Q.    What's the slowest you'd go on a

9  yellow road? Well, hypothetically, if

10  there was a yellow road the whole way

11  somewhere, what's the slowest you'd go?

12          MR. HOLMAN:  I'm going to object

13  to the form of the question because I

14  think he's disagreeing that there's like

15  a whole yellow road the way you're

16  characterizing it.

17          MS. EADY:  He's told me that the

18  speed levels are done -- the speed that

19  you travel at are done depending on the

20  threat level.  But he's told me what

21  speeds are done at a yellow level.  So,

22  I'm going to have to come up with some

23  way -- and a hypothetical yellow road

**FREEDOM COURT REPORTING**

1    right now is the best way that I know of.

2    He was able to give me a range for

3    average, for a green day.  So, I really

4    don't see why he can't give me an average

5    for yellow and red if he can do it for

6    green.

7              MR. HOLMAN:  If you're able to

8    answer the question, answer the question.

9    But don't agree with a scenario or --

10         Q.   (By Ms. Eady) I'm not asking you

11   to agree that there's ever a completely

12   yellow road.  But, hypothetically, if

13   there were a completely yellow road, what

14   speeds would you go at?

15         A.   70, 80K.

16         Q.   And if it is a --

17              MR. HOLMAN:  Excuse me.  You're

18   shrugging like you don't necessarily know

19   what you're saying or that you don't

20   agree with the question.  So, if you

21   don't, don't shrug.  You need to

22   express --

23              THE WITNESS:  No.  I mean, I'm

## FREEDOM COURT REPORTING

1    not trying to be difficult.  I'm just

2    saying, I mean, it's kind of hard to say

3    you know.  I mean, I understand the

4    question that you're asking me.  But it's

5    kind of hard for me to give you an

6    average on, you know, that type of

7    scenario because the only -- the only --

8    the only way I could tell you that was,

9    okay, while we were in training, you had

10   green, yellow, and red, you know.

11          But that, you know, that was

12   only green was on.  So, you had nothing,

13   you know, you had nothing to worry about.

14   But when you're outside of the -- you

15   know, when you get outside the gates, I

16   mean, every moment is red.  You know,

17   there's no just, you know, where you ride

18   with the windows down waving at people.

19   It's not like that.  I'm sorry.  I'm not

20   trying to be difficult.

21          Q.   On a red day, what speeds would

22   you go at?

23          MR. HOLMAN:  Same objection.

# FREEDOM COURT REPORTING

1           THE WITNESS:  I can't answer

2   that question.

3       Q.   What's the slowest you'd drive

4   on a red day?

5           MR. HOLMAN:  Same objection.

6       Q.   (By Ms. Eady) Outside of

7   Baghdad?

8       A.   I can't answer that question.

9       Q.   You can't tell me the slowest

10  speed you ever drove at on a red day when

11  you were traveling outside of Baghdad?

12          MR. HOLMAN:  Same objection.

13          THE WITNESS:  No, ma'am.

14      Q.   (By Ms. Eady) Do you remember

15  what speeds you would drive at when you

16  were in Iraq?

17      A.   Yes, ma'am.

18      Q.   All right.  Tell me what you

19  remember about the speeds.

20      A.   During a fire fight or not

21  during a fire fight?  Getting shot at or

22  not getting shot at?

23      Q.   Not during a fire fight.

## FREEDOM COURT REPORTING

1    A.    Having cars blown up next to me

2 or not having cars blown up next to me?

3    Q.    Not during a fire fight, not

4 having cars blown up.

5    A.    Inside Baghdad?

6    Q.    Outside Baghdad.

7    A.    Outside Baghdad.    Depending on

8 the area.

9    Q.    Tell me the differences in the

10 areas and the speeds that you'd go at as

11 you went through them.

12    A.    Ramadi and Fallujah were always

13 considered red areas.    From the Baghdad

14 airport to Gate 12 was always considered

15 a red area.

16    Q.    Okay.

17    A.    Going to Babylon, Hilla, Kirkuk,

18 Irbil, Turkey.

19    Q.    And what speeds did you go to

20 those at is what I'm trying to get at.

21    A.    If everything was normal during

22 that -- during that period that you were

23 driving, 80 -- 70, 80K.

## FREEDOM COURT REPORTING

1    Q.    All right.

2    A.    If things got --

3    Q.    Abnormal?

4    A.    -- abnormal, you increased

5  speed, depending on, you know, the

6  location and your surroundings to 120,

7  130K.

8          If things became heated, you

9  would increase speeds to whatever it took

10  to get out of that situation.

11    Q.    All right.  And what kind of

12  situations make for a heated -- what kind

13  of circumstances make for a heated

14  situation?

15    A.    Repeat the question, please.

16    Q.    You said if things got heated --

17  well, first of all, you said, if things

18  were normal in a red area, you'd go on an

19  average 70 to 80K.  Then you said if

20  things got abnormal, you would increase

21  speed, depending on the location and your

22  surroundings as needed.  And you said if

23  things got heated -- well abnormal,

# FREEDOM COURT REPORTING

1    increase speed, depending on your

2    location and your surroundings up to 130

3    to 140K; was that correct?

4         A.    Yes, ma'am.

5         Q.    All right.  And then you said if

6    things were -- things became heated,

7    you'd do whatever you could to get out of

8    there.  What makes things become heated?

9         A.    Car bombs, IEDs.

10        Q.    Is this the suspicion that

11   they're there, or this there's actually

12   been one that goes off?

13        A.    The intel that you're getting at

14   the time that you're moving through that

15   area.

16        Q.    And do you get that intel on

17   like radio phones or something?

18        A.    Yes, ma'am.

19        Q.    How far apart are the vehicles

20   supposed to be as they travel?  Or is

21   there a set distance the vehicles are

22   supposed to be apart from each other?

23        A.    No, ma'am.

# FREEDOM COURT REPORTING

Page 137

1  from the time Mr. Potts was injured until

2  the time you came back in December?

3      A.   300.

4      Q.   But how many long-range

5  missions?

6      A.   I don't remember.  I mean, it

7  could have been maybe 100, 150.

8      Q.   Okay.

9          MS. EADY:  Do any of y'all have

10 questions?

11         MR. HOLMAN:  I've got a couple.

12         MS. EADY:  If you'll go ahead.

13 I'm probably done, but I'm going to look

14 at my notes.

15         MR. HOLMAN:  Let's take a little

16 recess.

17         (A short break was taken.)

18

19 EXAMINATION BY MR. HOLMAN:

20     Q.   Mr. McCants, were the speeds

21 that you all would travel at in these

22 convoys based on hard and fast rules, or

23 were you supposed to react to the

**FREEDOM COURT REPORTING**

Page 138

1  situations as you all perceived them

2  during the course of the convoy?

3      A.    We had to react to the situation

4  depending on the severity at the time,

5  your surroundings, things that were going

6  on while you were on that mission.

7      Q.    Does the convoy -- or would the

8  convoys go at speeds that were deemed

9  necessary to deal with the perceived

10  threat?

11      A.    Yes, sir.

12      Q.    In this case, did this convoy on

13  this particular day consider those parked

14  vehicles and the people standing outside

15  of them to be a potential threat to the

16  convoy?

17          MS. EADY:  Object to the form,.

18          MR. HOLMAN:  What's wrong with

19  the form?

20          MS. EADY:  Leading.

21          MR. HOLMAN:  I asked him --

22      Q.    Okay.  That's fine.  Go ahead

23  and answer your question.  Did you

# EXHIBIT  H

# FREEDOM COURT REPORTING

1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3              EASTERN DIVISION

4

5    CASE NUMBER:  3:06-CV-00124-WHA

6    JOHNNY POTTS AND JANICE POTTS,

7            Plaintiffs,          **COPY**

8            VS.

9    DYNCORP INTERNATIONAL, LLC; JAMES McCANTS,

10   ET AL.,

11           Defendants.

12

13           S T I P U L A T I O N

14           IT IS STIPULATED AND AGREED by

15   and between the parties through their

16   respective counsel, that the deposition of

17   JOHNNY POTTS may be taken before RENA'

18   MESSICK LANIER, Court Reporter and Notary

19   Public for the State of Alabama at Large,

20   at the office of Barnes & Radney at 80

21   North Central Avenue, Alexander City,

22   Alabama  35010, on the 14th day of

23   September, 2006.

# FREEDOM COURT REPORTING    49

1    compounds.  You know, military -- some

2    military, like where I was, I was at the

3    Baghdad Hotel, and we had military on top

4    of that.  Some didn't have military in

5    their compounds.

6              When I say compounds, I'm

7    talking about different police posts.  So

8    I'm not talking about military posts.

9         Q.      Okay.  So before you ever

10   went over there in the first place, you

11   knew that a war had recently been fought

12   over there; is that correct?

13        A.      Yes.

14        Q.      And you also knew that the

15   United States military was occupying the

16   country?

17        A.      Yes.

18        Q.      And they had combat troops

19   still in Iraq?

20        A.      Yes.

21        Q.      And that from time to time

22   they were involved in hostile engagements

23   with insurgents?

# FREEDOM COURT REPORTING    50

1       A.       Yes.

2       Q.       And you knew at that point

3   that not only soldiers were still dying in

4   Iraq but that also civilians were from

5   time to time dying as well?

6       A.       Yes.

7       Q.       But you still voluntarily

8   went over to Iraq to take that job?

9       A.       Yes.

10      Q.       What to your knowledge is

11  the nature of WWNS's business?

12      A.       In Iraq and Afghanistan, the

13  nature of the business -- we were

14  subcontractors for DYNCORP as far as what

15  I knew.

16           We took care of everything

17  that they had.  When I say everything, I

18  mean, the cars; that building like the

19  Baghdad, we provided all the I.T., which

20  is the internet stuff, the telephones.

21  And we did the communications.

22      Q.       Okay.  Do you know if -- was

23  WWNS subcontracted to any other companies

# FREEDOM COURT REPORTING    51

1    in Iraq?

2         A.    Not that I know of.  Not

3    that I know of.  Only DYN.

4         Q.    I'm sorry?

5         A.    It was only DYNCORP as far

6    as I knew.

7         Q.    So they also were not

8    contracted directly with the government in

9    Iraq as far as you knew?

10        A.    As far as I knew it was just

11   DYNCORP.

12        Q.    Strictly a DYNCORP

13   subcontractor?

14        A.    As far as I know.

15        Q.    Now, did you understand that

16   you would be going to various DYNCORP

17   installations and military installations

18   before you went over there?

19        A.    Yes.

20        Q.    Did they tell you that the

21   locations or that DYNCORP had locations

22   other than in Baghdad?

23        A.    Yes.

# FREEDOM COURT REPORTING    52

1          Q.      And you were aware that you

2     would from time to time perhaps be called

3     on to go to outlying locations in Iraq?

4          A.      Yes.

5          Q.      And you voluntarily

6     undertook that job knowing that you would

7     be called to go into the outlying areas of

8     Iraq?

9          A.      Yes.

10          Q.      Did you tell me the date

11     when you actually went in country,

12     Mr. Potts?

13          A.      In Iraq?

14          Q.      Yes, sir.

15          A.      I don't remember the exact

16     date.

17          Q.      You think it was in July?

18          A.      It was the first of July.

19          Q.      The first part of July?

20          A.      Yes.

21          Q.      Had you had any training in

22     being an electronics technician before you

23     went over there?

# FREEDOM COURT REPORTING    53

1          A.      No.

2          Q.      How long was your job

3    supposed to last over there, your

4    contract?

5          A.      Well, I had a year.  My

6    first contract was a year.  And I probably

7    could have stayed as long as I wanted to.

8          Q.      Yeah.  You could have come

9    back at any time you wanted to

10   voluntarily; is that right?

11         A.      Yes.

12         Q.      Just resigned and hopped on

13   a flight and gotten back?

14         A.      Yes.  But that contract

15   stated though they may try to -- if you

16   didn't fulfill your year commitment, they

17   may try to sue you for the fees of getting

18   you over there.  They stated that in the

19   contract.  But it wasn't an at-will

20   contract like my last one was.

21         Q.      But nevertheless if you

22   didn't want to do the work --

23         A.      Yes.

# FREEDOM COURT REPORTING    54

1          Q.        -- and were willing to take

2    the consequences --

3          A.      Yes.   Yes.

4          Q.        -- you could have left at

5    any time?

6          A.      Yes.   Any time.

7          Q.        Tell me what training that

8    you got once you got over to -- well, let

9    me back up and ask:   Where did you fly to

10   initially?

11         A.      I left Atlanta and went to

12   Germany for like a twelve-hour layover.

13   Left Germany, went to Jordan for a couple

14   of days.  And then from Jordan went to

15   Iraq.

16         Q.      Tell me what training that

17   you got once you got over there.

18         A.      We had a couple day training

19   put on by Crucible.

20         Q.      What did it consist of?

21         A.      Same thing.  Range rules and

22   different weapons, how to use those

23   weapons, unloading and reloading, which is

# FREEDOM COURT REPORTING    55

1    the same thing as just familiarization

2    with weapons.  And then we went out and

3    shot the next day.

4             Q.      Range rules?  Is that

5    learning the rules for the firing range?

6             A.      Yes.

7             Q.      And why was it that they

8    were giving you weapons training?

9             A.      I guess just to be able to

10   survive in Iraq, I guess.

11            Q.      It was because there were

12   people who might try to kill you over

13   there, wasn't it?

14            A.      Yes.

15            Q.      And there were insurgents

16   who by that time they had started using

17   these IEDs, or improvised explosive

18   devices?

19            A.      Yes.

20            Q.      And they were blowing up

21   convoys by having these bombs on the sides

22   of roads and setting them off?

23            A.      Yes.

# FREEDOM COURT REPORTING    56

1          Q.     And at that point, there

2    were also ambushes occurring where there

3    would be insurgents who would attack

4    convoys with rifles or rocket-propelled

5    grenades?

6          A.     Yes.

7          Q.     And that was already going

8    on by the time you got over there; is that

9    right?

10         A.     Yes.

11         Q.     And if you weren't aware of

12   it before you -- well, were you aware of

13   that circumstance before you went over

14   there?

15         A.     Yes.

16         Q.     And that was reinforced with

17   you during the course of your Crucible

18   training there in Iraq; is that right?

19         A.     Yes.

20         Q.     Did they give you any kind

21   of training with respect to dealing with

22   ambushes?

23         A.     Not really.  We just

# FREEDOM COURT REPORTING    74

1    guys, a driver and what they call a

2    shooter.  I was in the back by myself.

3              But then he had a lead and a

4    trail car or vehicle.  And it was a couple

5    of guys in each -- each car, each vehicle.

6         Q.    And they had guns?

7         A.    Yes.

8         Q.    Did the driver have a gun?

9         A.    He had a nine-millimeter.

10    You know, he couldn't drive and have a

11    rifle too.

12        Q.    Sure.

13        A.    But we had one in the car.

14        Q.    What did the shooter have?

15        A.    He had what they call an

16    M14.  M14?  M4.  Which is to you and I

17    something like a -- what am I thinking --

18    M -- not an M, an AR-15.  That's what it

19    looks like if you know what those are.

20        Q.    Did they give you a gun?

21    Did you have a weapon at that point?

22        A.    The driver handed me a nine-

23    millimeter just in case when we first got

# FREEDOM COURT REPORTING    75

1    there.

2           Q.      So even from driving from

3    the airport when you first got in country

4    going to your hotel, you had an armed

5    escort, and they even gave you a pistol to

6    help out in case they got ambushed?

7           A.      Yes.

8           Q.      And you didn't turn around

9    and head back to the airport at that

10   point?

11          A.      No.

12          Q.      Was it obviously a different

13   kind of situation, Mr. Potts, from what

14   you had in Kosovo?

15          A.      Yes.

16          Q.      I mean, it was an immediate

17   security threat from essentially the time

18   you left the airport?

19          A.      Yes.

20          Q.      How did they drive from the

21   airport to the Baghdad Hotel?

22          A.      High rate of speed.  They

23   call it a serpentine where they, you know,

# FREEDOM COURT REPORTING    76

1    if this is the middle of the road and

2    they're doing this going down the highway

3    (indicating).

4              Q.      You're moving your hands

5    back and forth sort of like, you know, how

6    a lie detector --

7              A.      Lane to lane.  Lane to lane.

8              Q.      Yeah.  Lane to lane.  Okay.

9    Going back and forth?

10             A.      Yes.

11             Q.      I was going to say kind of

12   like a lie detector would show a squiggly

13   line going down the paper.

14                     MS. EADY:  Like a fish in a

15   brook.

16                     MR. HOLMAN:  Yes.  Yes.

17             Q.      (BY MR. HOLMAN)  So they

18   were actually taking evasive maneuvers

19   just to drive you from the airport to your

20   hotel?

21             A.      Yes.

22             Q.      What kind of highway was it?

23             A.      It was a decent highway.  It

# FREEDOM COURT REPORTING    77

```
1    was a two-lane highway on each side.
2         Q.    Like an interstate?
3         A.    Pretty much.  The roads are
4    pretty good.
5         Q.    Did it have a median?
6         A.    Yeah.  It had a dirt median.
7         Q.    Okay.  Did it have a
8    shoulder?
9         A.    You talking about on the
10   right side?
11        Q.    Right.
12        A.    Yeah.
13        Q.    How far of a drive was it?
14        A.    You talking about actual
15   driving time?  Or --
16        Q.    Do you have an estimate of
17   what the distance was from the airport to
18   your hotel?
19        A.    Probably about -- hard to
20   say.  Ten to twenty miles maybe.  Maybe
21   that far.
22        Q.    What speeds were they going
23   when they were doing this?
```

# FREEDOM COURT REPORTING    78

1          A.      Sixty-five and seventy.

2          Q.      All right.  Did they go

3   under any underpasses in the course of

4   driving from the airport to the hotel?

5          A.      One or two.  Not many.

6          Q.      Did they do anything in

7   particular when they went under the

8   underpasses that you recall?

9          A.      These guys, they -- they

10  were looking out.  They was supposed to

11  have been looking out for anything

12  suspicious, you know.  So yeah, they --

13  I'm sure they were.  Yeah.  I was just in

14  the back just riding basically.

15         Q.      Did you sit in the middle?

16         A.      No.  I sat behind the

17  passenger.

18         Q.      Okay.  Did the driver and

19  the shooter, did they actually appear to

20  be very attentive to their surroundings?

21         A.      Yes.

22         Q.      So you didn't get the

23  impression from them that they considered

# FREEDOM COURT REPORTING    79

1    it just a romp in the countryside with no

2    real danger; you perceived them to be

3    alert to actual possible dangers to your

4    vehicles?

5         A.    Yes.

6         Q.    All right.  Did they take

7    you directly to the Baghdad Hotel?

8         A.    Yes.

9         Q.    Is that where WWNS had its

10   offices?

11        A.    Yes.  We had one there and

12   one at the other hotel there in Baghdad

13   which was called the Al Sadeer.  Now, how

14   you spell that, I don't know.

15        Q.    Al Sadeer?

16        A.    Yes.

17        Q.    Is that A-L or E-L?

18        A.    I think it's A-L.

19        Q.    Okay.  Was that anywhere

20   near the Al Kaleidos?  Does that name ring

21   a bell?

22        A.    Al Kaleidos is -- I don't

23   remember exactly where the Al Kaleidos

# FREEDOM COURT REPORTING [101]

1  country when you made the first Tikrit

2  trip?

3      A.    Probably a month maybe.

4      Q.    Okay.  So that would have

5  been around the first part of August?

6      A.    Yes.

7      Q.    Was that the first say road

8  trip that you had been on?

9      A.    No.  I think I went to

10  Mosul.  Mosul was the first road trip I

11  ever went on.

12      Q.    Okay.  Well, let's talk

13  about the Mosul trip first then.  Were you

14  in one of those personal security details

15  or what you call a convoy to go Mosul?

16      A.    Yeah.  Any time you left the

17  Baghdad, you had to take security.  And I

18  forgot what that security was called.  It

19  was actually put on -- it was actually

20  like natives of Iraq.  They were called

21  something else, but I don't remember.

22      Q.    LN's?

23      A.    No.

# FREEDOM COURT REPORTING 102

1      Q.     Local nations?

2      A.     Yeah, it was local

3  nationals.  But they were called something

4  else.

5      Q.     Sandy group?

6      A.     No.  It wasn't them.

7      Q.     Corporate Bay?

8      A.     No.

9      Q.     They were called something.

10  I don't remember what it was.  But you

11  always had to go -- you at least had to

12  take two of those cars with you with at

13  least three or four people in each car.

14  Because you got a driver and three

15  shooters in each car.

16      Q.     How would they configure

17  that?  Would they put a spotter car or

18  something out, or a lead car?

19      A.     Yes.  You always had a lead

20  car.  Then in this particular one going to

21  Mosul, we had a lead car, our car and then

22  a trail car.  So it was just three cars

23  went to Mosul.

# FREEDOM COURT REPORTING 108

1  anybody besides DYNCORP set up the rules

2  for how these movements would be made?

3       A.      No.   When I got there,

4  everything was, you know, set in place.

5  You just had to go by these rules.

6            And then, you know, after so

7  long when I got there, somebody came up

8  with the rule where you had to write the

9  serial number of your weapon down before

10 you left the compound.

11      Q.      You had to do what?

12      A.      Write the serial number of

13 your weapon down.

14      Q.      Why was that?

15      A.      I have no idea.

16      Q.      Was there any kind of rule

17 of you having to keep your weapon below

18 window level?

19      A.      Not in Iraq.  We, you know,

20 you needed to have your window cracked

21 where you could hear.  Never really had

22 them fully open.

23      Q.      Were you guys from WWNS in

# FREEDOM COURT REPORTING 109

1    that middle vehicle, were you all vigilant

2    to possible threats yourselves and keeping

3    a watch?

4              A.       Yes.

5              Q.       You weren't just listening

6    to the radio and yuckying it up with one

7    another?

8              A.       No.    Never had a radio, no.

9              Q.       How far is it from the hotel

10   to Mosul?

11             A.       Mosul wasn't as far as

12   Tikrit.   Mosul was probably forty-five

13   minutes maybe.

14             Q.       What kind of highways were

15   those?

16             A.       The highways are pretty

17   good.   Forty-five minutes maybe.

18             A.       It was paved.   I remember

19   that.   And once we got to their compound,

20   it was -- it was pretty decent roads too.

21             Q.       Was it a four-lane road like

22   two lanes in each direction?

23             A.       I don't really remember

# FREEDOM COURT REPORTING 110

1    going to Mosul.  Mosul might have just

2    been a two-lane highway.  It could have

3    been just a two-lane highway.  I don't

4    really remember though.

5          Q.      Did y'all do the weaving

6    back and forth?

7          A.      Not really.

8          Q.      What kind of speeds did

9    y'all go at?

10         A.      Between sixty and seventy.

11         Q.      Even if it were on a two-

12   lane, one lane in each direction?

13         A.      Yes.  We traveled around

14   sixty or seventy usually.

15         Q.      Are you aware of any legal

16   speed limits in Iraq?

17         A.      Well, I mean, they had some

18   posted.  But I don't -- I don't never

19   remember looking at a sign and saying, oh,

20   I better obey the speed limit.

21         Q.      Are you aware of anybody

22   that you knew of who obeyed some kind of

23   posted speed limit?

# FREEDOM COURT REPORTING 111

1    A.    No.    The general rule was

2    when you got on the highway you just

3    traveled at a high rate of speed.

4        Because they figured that

5    people that were shooting at you didn't

6    have sophisticated enough weapons to

7    really try to hit you.  It's just that,

8    you know, they just want you to be moving

9    at a high rate of speed for some reason.

10   I don't know.

11       Q.    Would you agree that that

12   would mean you were exposed to -- if the

13   threat was at a fixed point, the higher

14   the rate of speed that you could pass that

15   fixed point the less time they would have

16   to shoot at you?

17       A.    I think that was what it was

18   all about.

19       Q.    The same way with a bomb.

20   It would be a shorter window of timing to

21   set off a device when you were exposed to

22   the device?

23       A.    Yes, I think so.

# FREEDOM COURT REPORTING    116

1    compound, right?

2        A.      Yes.   That was at our

3    compound.

4        Q.      So y'all didn't do a lot of

5    driving around in Baghdad for the purpose

6    of installing electronics?

7        A.      Not much.

8        Q.      It was just to go to some

9    meetings?

10       A.      Just go to meetings.  And

11   then if we went anywhere else, we'd go

12   out.  But we didn't have a thing where we

13   went out every day in Baghdad.

14       Q.      Well, would there be days

15   when you wouldn't leave the compound?

16       A.      Several days.

17       Q.      All right.  But any time

18   that you left that compound and say went

19   to the Al Sadeer or whatever you were

20   talking about, would y'all be in one of

21   these personal security details?

22       A.      You always had to take

23   security with you wherever you went no

# FREEDOM COURT REPORTING 117

1    matter what.

2        Q.    So any time you went outside

3    the compound you were with people who had

4    weapons and were guarding your security?

5        A.    Yes.

6        Q.    And you had a weapon and

7    were guarding your own security?

8        A.    Yes.

9        Q.    Okay.  Now, this trip up to

10   Tikrit, how many -- you said that there

11   were five or six vehicles on that trip?

12       A.    Yes.

13       Q.    Was there a DYNCORP presence

14   in your particular vehicle?

15       A.    Not in my particular

16   vehicle.  But there was some with us.

17       Q.    All right.  What kind of

18   vehicle did y'all have for that?

19       A.    We actually rode -- DYNCORP

20   actually gave us a couple -- a couple of

21   armored cars for our use.

22       Q.    Were they Suburbans?

23       A.    Yes.  But this particular

# FREEDOM COURT REPORTING 124

1   break or if you feel like standing up --

2           A.      I'm fine.

3           Q.      -- or anything like that,

4   feel free.

5                   MS. EADY:  How much more?

6                   MR. HOLMAN:  Plenty.

7                   MS. EADY:  I didn't know.

8   Two hours?  Three hours?

9                   MR. HOLMAN:  I doubt that I

10  will be finished with Mr. Potts before

11  lunch.  If you want to take a break right

12  now, it's been two hours.

13                  MS. EADY:  I could use a

14  short one.

15                  MR. HOLMAN:  Okay.

16      (Short break.)

17          Q.      (BY MR. HOLMAN)  When you

18  were there, did you hear of any ambushes

19  or attacks on security details?

20          A.      Yes.

21          Q.      Tell me what you heard.

22          A.      The chief of security of

23  Baghdad security, he had -- he had been

# FREEDOM COURT REPORTING 125

1    involved in I'm not going to say an

2    ambush, but he had a situation where they

3    had to fire several different rounds or

4    several rounds.

5              It was an attack on them.  It

6    may have been an ambush.  But I know they

7    got caught up in some fire.

8        Q.      Did you hear of an ambush

9    perhaps a few days prior to your accident

10    in which a DYNCORP security detail was

11    ambushed and at least one person was

12    killed in the detail?

13        A.      That might have been the one

14    Derrick was in.  I'm not too sure.  But,

15    you know, things happen so fast over

16    there.  The day went by so fast or the

17    days went by so fast.

18              That could have been the same

19    one or, you know, there were many ambushes

20    daily or, you know, every other day.

21              So, yeah.  I mean, I could

22    have heard of it.  But I don't -- you

23    know, I know several -- I know several

FREEDOM COURT REPORTING    126

1    DYNCORP people got killed during my little

2    time there.

3                But I don't remember, you

4    know, right before my accident I don't

5    remember exactly which ones.

6            Q.      Were you over there when

7    this convoy got ambushed and they wound up

8    killing a couple of civilian employees and

9    stringing their bodies up on a bridge?

10           A.      I don't think I was there.

11           Q.      Do you remember seeing those

12   photos?  I mean, they were widely

13   publicized here in the States.

14               They were burned and then

15   they were hung up?

16           A.      I don't remember seeing

17   them.  I didn't -- I didn't pay that much

18   attention to Iraq before I went.

19               I mean, just basic stuff that

20   came on the news I paid attention to that.

21   But as far as watching CNN every day, no,

22   I didn't do that.

23           Q.      Okay.  But when you were

# FREEDOM COURT REPORTING 127

1  over there, you were conscious of the fact

2  that there were people who were doing the

3  very same thing that you were doing who

4  were actually getting bombed and shot?

5          A.      Yes.

6          Q.      And they were dying?

7          A.      Yes.

8          Q.      Or being injured?

9          A.      Yes.

10         Q.      Or being perhaps kidnapped?

11         A.      Yes.

12         Q.      Like there's a guy from -- a

13  driver from Mobile who has been missing

14  for two years now.

15              Have you heard of that

16  particular incident?

17         A.      I hadn't heard of that one.

18         Q.      What about the second trip

19  to Tikrit?  That was when you all went up

20  to -- is that north of Baghdad?

21         A.      I -- I believe it is.

22         Q.      Y'all went up there to put

23  the antennae in?

```
1              A.      Yes.
2              Q.      Was that the same size
3     convoy as the first time you went up
4     there?
5              A.      About the same.  Maybe --
6     maybe a car or two less.  Maybe.  But it
7     was -- it was more than two or three cars
8     when we went up there.
9              Q.      And in this incident again,
10    everybody in your vehicle had some kind of
11    weapon?
12             A.      Yes.
13             Q.      Either an AK-47 or some kind
14    of other rifle, and the driver had a
15    pistol?
16             A.      Yes.
17             Q.      And y'all as with your
18    previous trips were on the guard for
19    ambushes by insurgents?
20             A.      Yes.
21             Q.      Or perhaps an IED?
22             A.      Yes.
23             Q.      And it was a dangerous
```

# FREEDOM COURT REPORTING 129

```
1   circumstance?  You recognized that?

2          A.      Yes.

3          Q.      Okay.  Do you recall what

4   speeds that you all drove at this second

5   time you went to Tikrit?

6          A.      Not really.  Just basically

7   just trying to make time down the highway.

8          Q.      And, again, the high speeds

9   was a security function; isn't that right?

10         A.      As far as I knew.  I guess.

11         Q.      As well as trying to get

12  there in a hurry to get your job, but you

13  testified a few minutes ago that part of

14  the protocol, security protocol was to

15  expose yourself as little as possible to a

16  potential security threat?

17         A.      Yes.

18         Q.      Okay.  Now, after your Mosul

19  trip -- was the Mosul trip your first road

20  trip?

21         A.      That's the first road trip I

22  remember ever taking, yes.

23         Q.      Okay.  And after that, when
```

134

1           So I can't just pinpoint when

2     the next time was.  But it could have been

3     the next week or so.  And then we went

4     several weeks where we weren't allowed to

5     go anywhere.

6           Q.    Why was that?

7           A.    Threat level may have been

8     high that day or that week or whatever.

9     So they just kept us in.

10          Q.    So they wouldn't even let

11    you go outside the compound because it was

12    so dangerous?

13          A.    Yes.

14          Q.    When you went to the PX, was

15    that in the green zone?

16          A.    No.  That was on the

17    military base.  The green zone did have

18    some PX's.  But we went to another one.  I

19    can't -- I think it was Camp Victory I

20    believe.  That's where we had to get our

21    IDs at anyway.  So that's where we went.

22          Q.    Did you have to go in one of

23    these armed security details to get to the

# FREEDOM COURT REPORTING  135

1    PX?

2          A.      You always had to take

3    security with you.  You always had to take

4    those guys with you.

5               Even if say WWNS took two

6    cars, you still had to take two more cars

7    with you.  It was always three people --

8    at least three people in each vehicle.

9          Q.      And even when you were just

10   going to the PX to get some deodorant or

11   something like that, all of you guys had

12   to have your rifles and stuff?

13         A.      Yes.

14         Q.      Between the Tikrit trip and

15   this trip when the accident occurred, did

16   you go on any other say road trips?

17         A.      That's probably about it.

18   Didn't -- didn't do much traveling.  Did

19   some but not -- not much.

20         Q.      By the time this particular

21   road trip came around though, you already

22   knew the drill, pretty much what the

23   procedure was going to be?

229

1    Because I think when I got that, I got the

2    DYNCORP reports.  And Ron's statement was

3    with that.  I think it was maybe two

4    pages.  So when I got that, I got the

5    DYNCORP report.

6         Q.    All right.  Have you talked

7    to Ronnie Wood since the accident?

8         A.    Hadn't talked to Ron Wood

9    since the accident either.

10        Q.    Do you know where he is?

11        A.    I think he lives in either

12   North Carolina or South Carolina.

13        Q.    Okay.  Do you know what he's

14   doing?

15        A.    I have no idea.

16        Q.    All right.  You mentioned a

17   little while ago that you had been to

18   Afghanistan since you got back from Iraq?

19        A.    With WWNS.

20        Q.    When did you go over there?

21        A.    I left June 13th.

22        Q.    This past June 13th?

23        A.    Yes.

230

1          Q.     What was the purpose of your

2     trip over there?

3          A.     A lot of money.

4          Q.     A lot of money.  What did

5     they pay you to do that?

6          A.     They paid me -- they offered

7     me one-twenty to go.  And then when I got

8     there, it was a little more.  Or when I

9     got the contract, it was a little more.

10    It was one twenty-five.

11         Q.     They sent you a new

12    contract?

13         A.     Yes.

14         Q.     Do you have that contract?

15         A.     I have it.  I don't have it

16    with me, but I have it at home.

17         Q.     What did you do over there?

18         A.     Same thing I did in Iraq.

19    Communications tech.  Same type duties.

20            Q.    How long were you over

21    there?

22            A.    I was over there from June

23    13th until July.  I didn't stay but a

# EXHIBIT I

Westlaw.

--- F.Supp.2d ----                                                                                    Page 1

--- F.Supp.2d ----, 2006 WL 2795720 (S.D.Tex.)
**(Cite as: --- F.Supp.2d ----)**

Fisher v. Halliburton, Inc.S.D.Tex.,2006.Only the
Westlaw citation is currently available.
    United States District Court,S.D. Texas,Houston
                        Division.
    Ingrid FISHER, Individually and as Successor in
Interest to Decedent, Steven Fisher, et al, Plaintiff,
                           v.
    HALLIBURTON, INC., et al, Defendants.
              **Civil Action No. H-05-1731.**

                     Sept. 27, 2006.

**Background:** Employees of civilian contractor in
Iraq sued contractor in state court for, inter alia,
deploying their convoy as a decoy into an area
contractor knew to be under attack in order to
ensure the safe passage of a second convoy. After
removal, contractor filed motion to dismiss.

**Holding:** The District Court, Gray H. Miller, J.,
held that case presented a non-justiciable political
question.

Motion granted.

Opinion, 2010353793, amended and superseded.

**[1] Federal Courts 170B** ⚖0

170B Federal Courts
A case may meet every other jurisdictional and
justiciability hurdle and still be barred by the
presence of a political question.

**[2] Federal Courts 170B** ⚖0

170B Federal Courts
Political question doctrine excludes from judicial

review those controversies which revolve around
policy    choices    and    value    determinations
constitutionally committed for resolution to the
halls of Congress or the confines of the Executive
Branch.

**[3] Federal Courts 170B** ⚖0

170B Federal Courts
Prominent on the surface of any case held to
involve a political question is found (1) a textually
demonstrable constitutional commitment of the
issue to a coordinate political department; or (2) a
lack of judicially discoverable and manageable
standards for resolving it; or (3) the impossibility of
deciding without an initial policy determination of a
kind clearly for nonjudicial discretion; or (4) the
impossibility of a court's undertaking independent
resolution without expressing lack of the respect
due coordinate branches of government; or (5) an
unusual need for unquestioning adherence to a
political decision already made; or (6) the
potentiality of embarrassment from multifarious
pronouncements by various departments on one
question.

**[4] Federal Courts 170B** ⚖0

170B Federal Courts
Case in which employees of civilian contractor in
Iraq sued contractor for deploying their convoy as a
decoy into an area contractor knew to be under
attack in order to ensure the safe passage of a
second convoy presented a non-justiciable political
question; actions taken were, at best, the result of a
joint effort between the contractor and the Army,
and the contracts showed that the Army, not the
contractor, was responsible for the security of the
convoys, up to and including the force protection
for the trucks.

Christina Anne Fountain, Mary Katherine Bedard,
Vincent D. Howard, Jennifer R. Johnson, Ramon

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**DEFENDANT'S
EXHIBIT**
_I_

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 2795720 (S.D.Tex.)
**(Cite as: --- F.Supp.2d ----)**

Rossi Lopez, Jennifer Lee Thompson, Lopez, Hodes, Restaino, Milman & Skikos, Newport Beach, CA, Samuel Ainsworth Houston, Jennifer Bickham Swick, Cruse Scott Henderson & Allen LLP, Tobias A. Cole, Midani Hinkle Cole, Kenneth T. Fibich, W. Michael Leebron, II, Fibich Hampton, Houston, TX, for Plaintiff.

David Kasanow, Herbert Lawrence Fenster, Raymond B. Biagini, McKenna Long & Aldridge LLP, Washington, DC, James Stanley Teater, Katie J. Colopy, Jones Day, Robin P. Hartmann, A. Michael Warnecke, Haynes & Boone, Dallas, TX, Thomas A. Rector, Jones Day, San Francisco, CA, James H. Hall, Jones Day, Houston, TX, for Defendants.

### Amended Memorandum and Order

[Redacted Version for CM/ECF Filing]

GRAY H. MILLER, District Judge.

*1 Pending before the court is defendants' motion to dismiss.[FN1] Dkt. 135.[FN2] After considering the parties' arguments, exhibits, and the applicable law, the court concludes that the case presents a non-justiciable political question. Accordingly, the court lacks jurisdiction to hear this case. As such the defendants' motion to dismiss is GRANTED.

### Background

In 1985, as part of a program to augment Army forces, the United States Army implemented the Logistics Civil Augmentation Program or LOGCAP.[FN3] Under LOGCAP,[FN4] the Army awarded Brown & Root Services (KBR) contract No. DAAA09-02-D-0007 to provide essential services in support of the military in Iraq.[FN5] Military Task Orders 43 and 59 defined KBR's specific tasks, including the transportation services at issue in this case. To fill the jobs created by the contract, KBR recruited civilian personnel. KBR hired the plaintiffs [FN6] as part of a group to provide transportation services. After terminating their current employment, the plaintiffs were transported to Iraq and assigned to Camp Anaconda.[FN7]

On the morning of April 9, 2004, upon arriving at the convoy staging area, the plaintiffs learned the planned route for that day had been changed. The new route called for the convoys to deliver fuel to Baghdad International Airport (BIAP). BIAP was an unfamiliar destination for the drivers.[FN8] Many drivers merely followed the vehicle directly in front of them, who in turn, followed the Army's local Iraqi guide.[FN9] According to the Army report of the incident, military personnel, including six gunners, accompanied the plaintiffs' convoy.[FN10] Even so, the plaintiffs were the majority of the KBR manpower for the first of two convoys. The first convoy was attacked by anti-American forces and sustained heavy casualties. Six men were killed, eleven more were seriously wounded, and one man is still missing and presumed dead.[FN11]

The plaintiffs originally filed their claim in Harris County District Court in April, 2005. Dkt. 1, Tab 2. The defendants timely removed the case to federal court on May 13, 2005. The plaintiffs' most recent complaint alleges, among other things, that (1) the defendants' recruitment activities included knowing fraudulent statements regarding the safety and nature of the civilian work in Iraq in order to induce plaintiffs to accept employment, (2) the defendants knowingly and intentionally deployed the first April 9th civilian convoy as a decoy into an area they knew to be under attack to ensure the safe passage of the second convoy, and (3) the defendants had complete control over the decisions of when, where and how to deploy civilian convoys.[FN12] Their causes of action include state law fraud claims, wrongful death, intentional infliction of physical and emotional distress, violations of civil rights under § 1983, R.I.C.O., conspiracy, survivorship, and common law civil conspiracy. As a result they seek compensatory and exemplary damages.

*2 The defendants respond that the Army had control over the deployment and protection of convoys.[FN13] They argue that since their decisions are so interwoven with Army decisions, the court lacks jurisdiction over the case under the political question doctrine.[FN14] The court agrees.

### Political Question

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 3

--- F.Supp.2d ----, 2006 WL 2795720 (S.D.Tex.)
**(Cite as: --- F.Supp.2d ----)**

[1][2][3] A case may meet every other jurisdictional and justiciability hurdle and still be barred by the presence of a political question. *Vieth v. Jubelirer,* 541 U.S. 267, 277, 124 S.Ct. 1769, 1776, 158 L.Ed.2d 546 (2004). "Sometimes, [ ] the law is that the judicial department has no business entertaining the claim of unlawfulness." *Id.* "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Society,* 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986). Based on the concept of the separation of powers, political questions are addressed and redressed by the people through the political process.[FN15] *See Occidental of Umm Al Qaywayn v. Certain Cargo of Petroleum,* 577 F.2d 1196, 1203 (5th Cir.1978). The Supreme Court has set out a list of six formulations to aid courts in a "discriminating inquiry into the precise facts and posture of the particular case." *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962).
(1) Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department;
(2) or a lack of judicially discoverable and manageable standards for resolving it;
(3) or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;
(4) or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;
(5) or an unusual need for unquestioning adherence to a political decision already made;
(6) or the potentiality of embarrassment from multifarious    pronouncements    by    various departments on one question.

*Id.* "[O]ne of these formulations [must be] inextricable from the case at bar." *Id.* Here the nature of the litigation implicates several of the *Baker* formulations.

**1. Textual Constitutional Commitment to a Coordinate Branch.**

[4] The first and arguably most important formulation is a "textually demonstrable constitutional commitment of the issue to a coordinate political department." *Id.* The Constitution allocates the power of Commander in Chief of the United States Army and Navy to the executive branch. U.S. Const. art II, § 2, cl. 1. Additionally, the Constitution gives the power "[t]o raise and support Armies ... provide and support a Navy [and to] make Rules for the Government and Regulation of the land and naval Forces" to Congress. *Id.* at § 1, cls. 12-14. "Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense." *Tiffany v. United States,* 931 F.2d 271, 277 (2d. Cir.1991). Moreover, making war in a foreign land also implicates another equally compelling executive branch power, foreign policy. *Baker,* 369 U.S. at 211, 82 S.Ct. at 707. "Not only does resolution of [foreign policy] issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand [a] single-voiced statement of the Government's views." *Id. See also Occidental,* 577 F.2d at 1203 ("[I]n the realm of foreign relations, policy considerations render issues incompetent for a decision by the court ."); *Dickson v. Ford,* 521 F.2d 234, 236 (5th Cir.1975) (per curium) (finding conduct of foreign relations to be constitutionally committed to the executive and legislative branches.).

**\*3** The Constitution mandates that war and foreign policy are the provenance of the Executive. In recognition of this, courts have consistently held that issues involving war, and actions taken during war, are beyond judicial competence. *See, e.g., Rostker v. Goldberg,* 453 U.S. 57, 66, 101 S.Ct. 2646, 2652, 69 L.Ed.2d 478 (1981) (selective service registration for men, but not women) ("The operation of a healthy deference to legislative and executive judgments in the area of military affairs is evident in several recent decisions of this Court."); *Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 4

--- F.Supp.2d ----, 2006 WL 2795720 (S.D.Tex.)
**(Cite as: --- F.Supp.2d ----)**

2446, 37 L.Ed.2d 407 (1973) (training of National Guard troops) ("[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence."); *Farmer v. Mabus,* 940 F.2d 921, 923 (5th Cir.1991) (adjutant general's discharge after court-martial) ("[J]udicial intrusion into military matters is to be most cautiously and charily approached.... [T]he judicial process is manifestly ill-suited for the resolution of most of the myriad disputes which arise in that field."); *Bynum v. FMC Corp.,* 770 F.2d 556, 562 (5th Cir.1985) (government contractor defense) ("It has long been recognized that interference by civilian courts with military authority inevitably raises both questions about judicial competency in this area and separation of powers concerns."); *Tiffany,* 931 F.2d at 277 (military decision to shoot down potentially hostile aircraft) ("The strategy and tactics employed on the battlefield are clearly not subject to judicial review.").

If the Army were the defendant, then the commitment to a coordinate branch would be reasonably clear. However, the plaintiffs argue that the defendants may not shelter under the political question doctrine, because the plaintiffs' complaint (1) "involves claims by civilians, not military personnel," (2) "questions Defendants' actions as civilian contractors, not the Army's execution of a mission;" and (3) alleges that "Defendants, not the Army, [ ] deployed, directed, and controlled the civilian members of the Hamill Convoy,[FN16] thereby making inquiry into military decisions and rules of engagement unnecessary." [FN17] Even assuming the court found this statement to be true, the private character of the actions do not preclude the application of the political question doctrine. " Whether an issue presents a non-justiciable political question cannot be determined by a precise formula. " *Saldano v. O'Connell,* 322 F.3d 365, 368 (5th Cir.2003). The inquiry as laid out in *Baker* requires the court to posit whether a political question will arise during the course of the trial, not whether it is evident from the face of the complaint. *Occidental,* 577 F.2d at 1202. The political question "doctrine is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government; the identity of the *litigant* is immaterial to the presence of these

concerns in a particular case." *United State v. Munoz-Flores,* 495 U.S. 385, 394, 110 S.Ct. 1964, 1970, 109 L.Ed.2d 384 (1990). Here, the court finds that it cannot try a case set on a battlefield during war-time without an impermissible intrusion into powers expressly granted to the Executive by the Constitution.

### 2. Lack of Judicially Discoverable and Manageable Standards.

**\*4** The second *Baker* formulation is equally implicated. "One of the most obvious limitations [on the court] is that judicial action must be governed by *standard,* by *rule."* *Vieth,* 541 U.S. at 278, 124 S.Ct. at 1777. Those standards are particularly elusive in the case at bar, where the court cannot escape an examination of Army decisions, an area "not subject to judicial second-guessing." *In re Agent Orange Product Liability Litigation,* 818 F.2d 204, 206 (2d. Cir.1987). In the case at bar, the question becomes whether the court could extricate the defendants' acts from the Army's acts.

A review of the evidence submitted by the plaintiffs and the defendants shows the actions taken on April 9, 2004 were, at best, the result of a joint effort between the defendants and the Army. The contracts show that the Army, not the defendants, was responsible for the security of the convoys, up to and including the force protection for the trucks, [FN18] the intelligence regarding the possible routes, [FN19] the decision regarding which route to take, [FN20] and the manner in which the drivers were to operate.[FN21] The Army's investigative report regarding the incident amply demonstrates the Army's significant actual involvement in the events at issue.[FN22] Moreover, in a deposition taken by the plaintiffs, {REDACTED} confirms that the Army chose the routes for the convoys and requested that they be sent. [FN23] Also, email among KBR employees during the time before, during and after the April 9th incident indicate that the Army had a significant role in the deployment of convoys.[FN24] Regardless of whether the evidence may show that KBR had any ability to deploy or recall convoys, it most certainly demonstrates that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                          Page 5

--- F.Supp.2d ----, 2006 WL 2795720 (S.D.Tex.)
**(Cite as: --- F.Supp.2d ----)**

the Army was involved at each step in the process.

The plaintiffs argue that the contract language required the defendants "to manage and direct their own convoys." [FN25] They point to the Army publication, "Contractors on the Battlefield" and quote it as follows:
Management of contractor activities is accomplished through the responsible contracting organization, not the chain of command. Commanders do not have direct control over contractors or their employees (contractor employees are not the same as government employees); only contractors manage, supervise, and give directions to their employees.[FN26]

However, this quote is malapropos. It was taken from the Overview section of the manual in a subsection entitled Contractor and Military Distinctions. [FN27] A review of the manual reveals other, more applicable passages.Contractor Management in the Military Environment
[T]he regional combatant commander ... is responsible for accomplishing the mission and ensuring the safety of all deployed military, government civilian, *and contractor employees* in support of U.S. military operations.... To fully integrate contractor support into the theater operational support structure, proper military oversight is imperative.[FN28]

*5 And later under the Force Protection chapter, the manual states:Roles and Responsibilities
6-4. Protecting contractors and their employees on the battlefield is the commander's responsibility. When contractors perform in potentially hostile or hazardous areas, the supported military forces must assure the protection of their operations and employees. The responsibility for assuring that contractors receive adequate force protection starts with the combatant commander, extends downward, and includes the contractor.

...

6-6. Protection for contractors involves active use of armed military forces to provide escort or perimeter security, and passive measures that include protective military equipment, training, and equipping of contractor employees in self-protection.[FN29]
Far from supporting the contention that KBR had sole control over the safety of its convoys, the manual offers express proof that security started with the Army. The plaintiffs also quote from Army Regulation 715-9 to support the argument that under the governing contracts the Army was not allowed to direct KBR employees.[FN30] " Contracted support service personnel shall not be supervised or directed by military or Department of the Army (DA) civilian personnel." [FN31] Again, a closer examination of the regulations demonstrates instead that the Army was, at the very least, significantly involved in transportation and force protection decisions.
The Commander, AMC will ... [c]oordinate transportation (i.e ., to, from and within the theater), quality of life issues and force protection of deployed AMC contractors with the ASCC [Army Service Component Command].

...

[C]ontractor employees will be expected to adhere to all guidance and obey all instructions and general orders issued by the Theater Commander.[FN32]
The evidence shows overwhelmingly that the Army was an integral part of any decision to deploy and protect convoys.

In order to hear this case, the court would have to substitute its judgment for that of the Army. For example, the court would need to determine what intelligence the Army gave to KBR about the route, whether that intelligence was sufficient, what forces were deployed with the convoys, whether they were sufficient, and whether they performed properly. [FN33] Even if KBR had authority to deploy or recall the convoys, the court would still need to determine whether the Army could or should have countermanded that order. No judicial standards exist for making these determinations. To accept the plaintiffs' contentions that the defendants were in complete control of military vehicles transporting

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 2795720 (S.D.Tex.)
**(Cite as: --- F.Supp.2d ----)**

Page 6

military supplies through a combat zone would require the court both to suspend disbelief and to disregard the governing contracts and the army incident report. This feat the court is simply not prepared to attempt.

Even if the plaintiffs limited their arguments to what KBR did or did not do, eventually the court would be forced to distinguish between KBR's actions and the Army's actions. Because the defendants present a colorable argument based precisely on this distinction, the court would inexorably be drawn into an examination of Army decisions. And, the Army's decisions during a time of war present a particularly inappropriate question for judicial examination. *Tiffany,* 931 F.2d at 276 ("It would [be] unseemly for a democracy's most serious decisions, those providing for common survival and defense, [to] be made by its least accountable branch of government.").

**\*6** Finally, the textual commitment of military decisions to coordinate branches, as discussed earlier, has an inverse relationship to the lack of judicially discoverable and manageable standards for resolving the case. *Nixon v. United States,* 506 U.S. 224, 228-29, 113 S.Ct. 732, 735, 122 L.Ed.2d 1 (1993). The more a decision is committed to another branch or branches of government, the less likely a court will find judicially discoverable and manageable standards to apply. *Id.* The Constitution specifically gives the Executive Branch the role of Commander in Chief of the Army. U.S. Const. art II, § 2, cl. 1. The Army's actions and decisions in Iraq set the stage for this case. Every issue, every claim the plaintiffs make must be examined against the backdrop of battle. They are inextricably intertwined. Accordingly, the court finds that it lacks the standards to hear this case.

### 3. Nonjudicial Policy Determination and Lack of Respect.

If the second formulation asks the court to determine what happened on April 9, 2004, then the third formulation requires an examination of why it happened. In the broadest sense, the Executive Branch policy of using civilian contractors to free up military personnel for military missions would be under scrutiny. In the narrowest sense, the question would become why the defendants and the military sent two convoys on the road to BIAP on that fateful day. Is it wise to use civilian contractors in a war zone? Was it wise to send the convoy along the route to BIAP on April 9, 2004? Answering either question and the many questions in between would require the court to examine the policies of the Executive Branch during wartime, a step the court declines to take. Courts are "not tribal wisemen dispensing divinely or theoretically inspired judgments, but [are] limited to the application of predetermined law." *Occidental,* 577 F.2d at 1203.

### Conclusion

The court concludes that this case presents a non-justiciable political question. The case at bar meets not one, but three of the formulations described in *Baker v. Carr. See Baker,* 369 U.S. at 217, 82 S.Ct. at 710. Nor is the court alone in this conclusion. Two recent federal court cases involving suits against civilian contractors in Iraq were dismissed on similar grounds. In a case involving the bombing of a dining facility managed by KBR for the Army in Iraq, Judge Sim Lake dismissed the case for want of jurisdiction based on political question. *Smith v. Halliburton,* No. 4:06CV0462, 2006 WL 2521326, (S.D.Tex. Aug.30, 2006). Also, in a Georgia case, the district court dismissed as non-justiciable a negligence case brought by the family of a U.S. soldier killed while escorting a KBR convoy. *Whitaker v. Kellogg Brown & Root,* No. 4:05-CV-78, 2006 WL 1876922, (M.D.Ga. July 6, 2006).

For the foregoing reasons the court finds that it lacks jurisdiction to hear the above-styled case, because it presents a non-justiciable political question. Accordingly, the defendants' motion to dismiss is GRANTED. Dkt. 135. The case is DISMISSED for want of jurisdiction.

**\*7** It is so ORDERED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 7

--- F.Supp.2d ----, 2006 WL 2795720 (S.D.Tex.)
**(Cite as: --- F.Supp.2d ----)**

FN1. The defendants filing the motion are Halliburton Company; Kellogg, Brown & Root, Inc., Service Employees International, Inc.; Kellogg, Brown & Root Services, Inc.; DII Industries, LLC; and Kellogg, Brown & Root International, Inc.

FN2. The memoranda in support and in opposition to the motion are filed with the court under seal. Dkts. 139, 140, 141, 149, 153, 155, 156, and 159. Additionally, the defendants filed a notice of supplemental authority, and plaintiffs responded, both not under seal. Dkts. 160 and 161.

FN3. Dkt. 141, Exhibit B, at 1-1. The purpose of LOGCAP was to replace some services currently performed by Army personnel with civilian contractors. *Id.* Those Army personnel would then be available for other missions. *Id.*

FN4. The court used definitions of Army terms and acronyms from the Records Management and Declassification Agency website. This database is available to the public at http://www2.arims.army.mil/a bbreviation/MainMenu. asp.

FN5. Dkt. 141, Exhibit C.

FN6. The plaintiffs are the personal representatives of the deceased drivers, Steven Fisher, Timothy Bell, William Bradley, Steven Hulett, Jack Montegue, Jeffrey Parker and Tony Johnson.; the injured drivers, Michael Brezovay, Nelson Howell, Jackie Lester, William Peterson, Edwards Sanchez Jr., Calvin Keith Stanley, Raymond T. Stannard, Ricky L. Tollison, Danny R. Wood, and James Blackwood; and their families. Although not all of the plaintiffs were truck drivers in Iraq, the court will use the term "the plaintiffs" throughout to mean either the truck drivers or those bringing the action according to context.

FN7. *See,* Dkt. 74.

FN8. Dkt. 141, Exhibit A-A, at 3-9.

FN9. *Id.*

FN10. *Id.*

FN11. Dkt. 74, at 26.

FN12. Dkt. 74, at 26.

FN13. Dkt. 140.

FN14. *Id.* They also argue that they are entitled to official immunity, and alternatively that the plaintiffs' only legal recourse is defined under the Defense Base Act, 42 U.S.C. § 1651(a). *Id.* The court does not reach those issues, since its determination that it lacks jurisdiction renders them moot.

FN15. The court notes that the political process has begun to address the very issues raised in this case. Congress has shown interest in contractor safety in Iraq. The Senate Democratic Policy Committee has just recently conducted "a hearing about contracting abuses." *See, e.g.,* David Ivanovich, *Halliburton Ignored Dangers, Drivers Say,* Houston Chronicle, Sep. 18, 2006, *available at* http://www.chron.com/disp/story.mpl/headline/biz/4196908.html.

FN16. Mr. Hammill was the lead KBR civilian truck driver for the first convoy on April 9th. He is not a party to this suit. Dkt. 74, at 26.

FN17. Dkt. 149, at 34-35.

FN18. LOGCAP Contract # DAAA09-02-D-0007 governing the relationship between the defendants and the Army states in relevant part:
{REDACTED}
Dkt. 141, Exhibit C, at 00004. For an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

Page 8

--- F.Supp.2d ----, 2006 WL 2795720 (S.D.Tex.)
**(Cite as: --- F.Supp.2d ----)**

identical provision under Task order 59, see Dkt. 141, Exhibit C, at 00076.

FN19. Task Order 59 dictates with regards to the transportation mission that {REDACTED} Task Order 59, Dkt. 141, Exhibit C, at 00066.

FN20. Under the Logistics Support Element of Task Order 59, the contract states that {REDACTED} Task Order 59, Dkt. 141, Exhibit C, at 00075.

FN21. {REDACTED} Task Order 59, Dkt. 141, Exhibit C, at 00081.

FN22. Dkt. 141, Exhibit A, at 3-9. {REDACTED} *Id.* at 4. { REDACTED} *Id.* at 5.

FN23. Dkt. 147, Exhibit U, at 17-18. {REDACTED} *Id.*

FN24. *Id.,* Exhibit O, at 1. {REDACTED} *Id.*

FN25. Dkt. 149, at 33.

FN26. *Id.*

FN27. Dkt. 149, Exhibit W, at 1-7.

FN28. *Id.* (emphasis added).

FN29. *Id.* at 6-2.

FN30. Dkt. 149, at 33.

FN31. *Id.*

FN32. Dkt. 149, Exhibit X, at 14.

FN33. *See,* Dkt. 74.

S.D.Tex.,2006.
Fisher v. Halliburton, Inc.
--- F.Supp.2d ----, 2006 WL 2795720 (S.D.Tex.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.